2005-NMSC-028

120 P.3d 413

**Christy Ann BREEN and Dahlia Carrasco, Claimants–Petitioners,**

v.

**CARLSBAD MUNICIPAL SCHOOLS, and New Mexico Public Schools Insurance Authority, Respondents–Respondents.**

No. 27,950.

Supreme Court of New Mexico.

Aug. 15, 2005.

Cusack, Jaramillo, Romero & Associates, P.C., Freddie J. Romero, Roswell, for Petitioners.

Yenson, Lynn, Allen & Wosick, P.C., Phyllis Savage Lynn, April D. Maschmeier, Albuquerque, for Respondents.

Robert L. Scott, Albuquerque, for Amicus Curiae New Mexico Trial Lawyers Association.

## OPINION

MAES, Justice.

{1} Christy Ann Breen and Dahlia Carrasco ("Petitioners") suffered temporary total primary mental impairments compensable under the New Mexico Workers' Compensation Act ("the Act"). They appeal a Workers' Compensation Judge's ("WCJ") order limiting their compensation to 100 weeks pursuant to NMSA 1978, Section 52–1–41(B) (1999), even though he found they have been disabled in excess of 240 weeks. Petitioners argue that Section 52–1–41 and NMSA 1978, Section 52–1–42 (1990), of the Act violate the Equal Protection Clause of both the New Mexico and United States Constitutions and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 to—12213 (2000), because those sections of the Act treat workers with physical impairments differently than workers with mental impairments. These Sections grant compensation for life for total permanent physical disabilities and up to 700 weeks of compensation for permanent partial physical disabilities, yet cap compensation for all primary mental disabilities at 100 weeks. They also argue that the WCJ should have awarded them compensation for the entire time they were disabled based on a prior Court of Appeals memorandum opinion which held Petitioners suffered compensable mental disabilities under the Act without determining the amount of compensation Petitioners were due.

{2} In this current appeal, the Court of Appeals affirmed the WCJ's determination that the Act did not violate equal protection or the ADA and that the prior Court of Appeals memorandum opinion was properly interpreted as only mandating 100 weeks of

compensation. *Breen v. Carlsbad Mun. Sch.,* 2003–NMCA–058, ¶¶ 3, 5, 133 N.M. 618, 67 P.3d 908. We granted Petitioners' petition for certiorari, pursuant to Rule 12–502 NMRA 2005, and now reverse on equal protection grounds. We hold that Sections 52–1–41 and –42 of the Act violate equal protection guarantees of the New Mexico Constitution by treating mentally disabled workers differently than physically disabled workers. Consequently, we do not reach Petitioners' ADA claim or their claim that the Court of Appeals erred in construing its previous memorandum opinion.

## FACTS AND PROCEDURE BELOW

{3} Petitioners were injured when the Carlsbad Municipal Schools remodeled portions of the building where they worked. Odors and dust from the remodeling project caused the Petitioners to suffer a conditioned psychological response that prevented them from continuing to work. The WCJ found that Petitioners suffered a primary mental impairment under the Act and were eligible for compensation. Before the WCJ determined exactly how much compensation Petitioners were entitled to, Respondents filed the first appeal in this case. Respondents challenged the WCJ's determination that Petitioners suffered a compensable primary mental impairment. The Court of Appeals consolidated the two claims, issued a memorandum opinion affirming the determination that Petitioners suffered a compensable primary mental impairment, and returned the case to the WCJ to determine the amount of compensation Petitioners should receive. *Carrasco v. Carlsbad Mun. Sch.,* Nos. 20,-833/20,832 (N.M.Ct.App. May 29, 2001) (consolidated). Respondents' petition for certiorari to this Court from that memorandum opinion was denied.

{4} Calculated from the date of injury, Petitioner Breen had been disabled for 240 weeks and Petitioner Carrasco had been disabled for 233 weeks on the date the Court of Appeals prior memorandum opinion was filed. However, the WCJ awarded Petitioners only 100 weeks of disability compensation in accordance with Section 52–1–41(B).

{5} This appeal is based on Petitioners' Application for Supplementary Compensation Orders filed after the WCJ awarded only 100 weeks of compensation. Petitioners seek to recover compensation for the total amount of time they have been disabled above the 100 weeks already awarded. At the hearing on the Application, Petitioners argued the same issues on appeal here: that compensating physical disabilities for life or up to 700 weeks, while limiting compensation for mental disabilities to 100 weeks, violated their rights under the Equal Protection Clauses of the New Mexico and United States Constitutions, as well as the ADA, and that the WCJ should award them "ongoing" disability compensation in accordance with the Court of Appeals' prior memorandum opinion. The WCJ entered a judgment denying the Application for Supplementary Compensation Orders, and Petitioners appealed to the Court of Appeals. On this appeal, Respondents do not contest the fact that Petitioners suffered a compensable mental disability under the Act or the number of weeks they have been disabled.

{6} The Court of Appeals affirmed the WCJ's orders. Specifically, the court held that: (1) the Act does not violate equal protection because, although Petitioners were similarly situated and subject to dissimilar treatment, there is a rational basis for the statutory scheme, *Breen,* 2003–NMCA–058, ¶ 14; (2) the Act does not violate the ADA because the ADA prohibits discrimination against disabled people in favor of the nondisabled, but does not prohibit discrimination amongst disabled people, *id.* ¶ 27; and (3) the WCJ properly awarded 100 weeks of disability benefits in accordance with the prior memorandum opinion, *id.* ¶ 7.

## DISCUSSION

### I. The Equal Protection Clause of the New Mexico Constitution

{7} Petitioners argue that their equal protection rights are violated by the Act because it caps all forms of compensation for persons with primary mental impairments at 100 weeks, while allowing substantially more compensation for persons with

physical impairments.[1] Petitioners argue the Act violates their equal protection rights by treating persons with mental disabilities differently from those with physical disabilities. Equal protection, both federal and state, guarantees that the government will treat individuals similarly situated in an equal manner. *See Wagner v. AGW Consultants*, 2005–NMSC–016, ¶ 21, 137 N.M. 734, 114 P.3d 1050. The New Mexico Constitution provides, "nor shall any person be denied equal protection of the laws." N.M. Const. art. II, § 18. Equal protection guarantees "prohibit the government from creating statutory classifications that are unreasonable, unrelated to a legitimate statutory purpose, or are not based on real differences." *Madrid v. St. Joseph Hosp.*, 1996–NMSC–064, ¶ 34, 122 N.M. 524, 928 P.2d 250. Petitioners claim that they are similarly situated with all other disabled workers, regardless of whether the disability is the result of physical or mental impairments. Thus, they claim that the government violated their equal protection rights by treating them differently on the sole basis of a mental, rather than physical, disability.

■■■ {8} There are several steps necessary to determine whether Petitioners' equal protection rights are violated by the Act. Petitioners must first prove that they are similarly situated to another group but are treated dissimilarly. In other words, Petitioners must prove that they should be treated equally with another group but they are not because of a legislative classification. If Petitioners are successful in proving this, then a court must determine what level of scrutiny should be applied to the legislation they are challenging. In equal protection challenges, a court will apply different levels of scrutiny depending on either the rights that the legislation affects or the status of the group of people it affects. *See Wagner*,

2005–NMSC–016, ¶ 12. Scrutiny means how closely the courts will analyze the rationales the proponent of the legislation offers in support of its constitutionality. Different levels of scrutiny also dictate which party has the burden of proof. Either the person challenging the legislation must prove that the statute is unconstitutional, or the party defending the legislation must prove that the statute is constitutional or comports with equal protection.

{9} In this section, we will first analyze whether under the Act persons with mental impairments are similarly situated with persons with physical impairments. Second, we will analyze what standard of review is appropriate to review legislation that affects persons with mental disabilities. This involves a discussion of whether the New Mexico Constitution affords greater protection than the United States Constitution. Third, we will discuss how we analyze intermediate scrutiny under the New Mexico Constitution. Finally, we will discuss if the Act's treatment of persons with mental disabilities is constitutional under equal protection analysis.

### A. Disparate Treatment of Similarly Situated Individuals

■■ {10} The threshold question in analyzing all equal protection challenges is whether the legislation creates a class of similarly situated individuals who are treated dissimilarly. *See Madrid*, 1996–NMSC–064, ¶ 35. Under the Act, a worker is eligible for compensation if he or she is unable to perform work duties because of an accident arising out of and in the course of his or her employment. NMSA 1978, § 52–1–25(A) (2003); NMSA 1978, § 52–1–25.1(A) (1990). Sections 52–1–41 and –42 create categories of similarly situated individuals, either totally impaired or partially impaired.[2] Within

1. The Act uses the term "impairment" to describe a worker's disability. NMSA 1978, § 52–1–24(A) (1990).

2. We note that the Legislature created an exclusive list of scheduled injuries. *See* NMSA 1978, § 52–1–43 (2003). This section dictates compensation for physical injuries to specific body parts. However, the Legislature did not include mental impairments in this list. Section 52–1–42 specif-

ically states that mental impairments are to be treated with all other non-scheduled impairments in the general category of permanent partial disability. This is appropriate because "mental impairment" is a general term that can refer to many different possible disabilities while the physical injuries on the scheduled injury list are specific.

those similarly situated groups, persons with mental disabilities are treated differently than those with physical disabilities. Workers who suffer total disability because of a physical injury can receive compensation for the rest of their lives, § 52–1–41(A), while workers who suffer total disability because of a primary mental impairment can only receive up to 100 weeks of compensation, § 52–1–41(B). Workers who suffer a permanent partial disability because of a physical injury can receive compensation up to 700 weeks, § 52–1–42(A)(1) and (2), while workers who suffer permanent partial disability because of a primary mental impairment can receive only 100 weeks of compensation, § 52–1–42(A)(3). Therefore, the Act results in dissimilar treatment of similarly situated workers.

## B. Standard of Review Applicable to Persons with Mental Disabilities

{11} The next step in analyzing an equal protection claim is to determine what level of scrutiny should apply to the challenged legislation. There are three levels of equal protection review based on the New Mexico Constitution: rational basis, intermediate scrutiny and strict scrutiny. *See Wagner*, 2005–NMSC–016, ¶ 12; *see also Trujillo v. City of Albuquerque*, 1998–NMSC–031, ¶ 32, 125 N.M. 721, 965 P.2d 305 [*Trujillo III* ] (abolishing fourth tier of equal protection analysis in New Mexico). Rational basis review applies to general social and economic legislation that does not affect a fundamental or important constitutional right or a suspect or sensitive class. *See Wagner*, 2005–NMSC–016, ¶ 12. This standard of review is the most deferential to the constitutionality of the legislation and the burden is on the party challenging the legislation to prove that it "is not rationally related to a legitimate government[al] purpose." *Id.* ¶¶ 12, 24.

{12} On the other end of the spectrum, strict scrutiny requires the most exacting review by a court. Only legislation that "affects the exercise of a fundamental right or a suspect classification such as race or ancestry" will be subject to strict scrutiny. *See Trujillo III*, 1998–NMSC–031, ¶ 16. If legislation affecting such rights or classifica-

tions is challenged, the party supporting the legislation has the burden of proving that the legislation furthers a compelling state interest. *Id.*

{13} Occupying a middle ground, intermediate scrutiny is more probing than rational basis but less so than strict scrutiny. *Id.* ¶ 15. Like strict scrutiny, the burden is on the party supporting the legislation to prove the constitutionality of the legislation; however, the party must only prove that the classification or discrimination caused by the legislation is "substantially related to an important government interest." *Id.* This standard of review has been previously applied to classifications based on gender and illegitimacy. *Id.; see, e.g., Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (gender); *Clark v. Jeter*, 486 U.S. 456, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988) (illegitimacy).

{14} We have previously recognized that the Equal Protection Clause of the New Mexico Constitution affords "rights and protections" independent of the United States Constitution. *See Chapman v. Luna*, 102 N.M. 768, 769–70, 701 P.2d 367, 368–69 (1985), *citing Dep't of Mental Hygiene v. Kirchner*, 62 Cal.2d 586, 43 Cal.Rptr. 329, 400 P.2d 321, 322 (1965) (holding that the Equal Protection Clauses of the Constitution of California and the United States Constitution "provide generally equivalent but independent protections in their respective jurisdictions"). While we take guidance from the Equal Protection Clause of the United States Constitution and the federal courts' interpretation of it, we will nonetheless interpret the New Mexico Constitution's Equal Protection Clause independently when appropriate. In *Trujillo v. City of Albuquerque*, 110 N.M. 621, 629 n. 5, 798 P.2d 571, 579 n. 5 (1990) [*Trujillo I* ], *overruled on other grounds by Trujillo III*, 1998–NMSC–031, ¶¶ 12, 19, 25, we stated that federal cases dealing with intermediate scrutiny do not control our development of intermediate scrutiny based on the New Mexico Constitution. Federal case law is certainly informative, but only to the extent it is persuasive. *See State v. Gutierrez*, 116 N.M. 431, 436, 863 P.2d 1052, 1057 (1993). In analyzing equal protection guar-

antees, we have looked to federal case law for the basic definitions for the three-tiered approach, but we have applied those definitions to different groups and rights than the federal courts.

{15} In analyzing which level of scrutiny should apply in an equal protection challenge, a court should look at all three levels to determine which is most appropriate based on the facts of the particular case. The determination of which level of scrutiny is applicable under the Constitution is a purely legal question, and is reviewed de novo. *See Pinnell v. Bd. of County Comm'rs*, 1999–NMCA–074, ¶ 17, 127 N.M. 452, 982 P.2d 503; *see also Montano v. Los Alamos County*, 1996–NMCA–108, ¶ 7, 122 N.M. 454, 926 P.2d 307; *Chavez–Perez v. Ashcroft*, 386 F.3d 1284, 1287 (9th Cir.2004); *Coalition for Fair and Equitable Regulation of Docks on Lake of the Ozarks v. Fed. Energy Regulatory Comm'n*, 297 F.3d 771, 778 (8th Cir.2002).

{16} In this case, all the parties agreed that strict scrutiny is not applicable. We agree with that determination. Petitioners and Respondents devoted much of their briefs to what rational basis test our prior cases adopted under the New Mexico Constitution. We discussed this question in *Wagner* and do not need to do so again here. 2005–NMSC–016, ¶¶ 11, 24, 137 N.M. 734, 114 P.3d 1050 (applying the modern rational basis test that requires the challenger to demonstrate the absence of a "firm legal rationale" or evidence in the record to support the legislative classification as articulated in *Trujillo III*. 1998–NMSC–031, ¶¶ 14, 30). Nevertheless, the courts should always make a determination of which of the three levels of scrutiny is applicable to a given case based on either the right or the nature of the group affected by the legislation. *See id.* ¶ 12 ("[W]e must identify the appropriate level of scrutiny for reviewing the challenged law."); *Trujillo III*, 1998–NMSC–031, ¶ 2 ("[I]t first is necessary to determine the applicable [level of scrutiny] analysis for this type of equal protection challenge.").

{17} We now turn to the question of whether intermediate scrutiny should apply to this case based on New Mexico jurisprudence. There are two different ways that legislation can trigger intermediate scrutiny review. The Legislation must either (1) restrict the ability to exercise an important right or (2) treat the person or persons challenging the constitutionality of the legislation differently because they belong to a sensitive class. In this case, the Act is general social and economic legislation and the benefits conferred under the Act do not rise to the level of important rights in the constitutional sense. *Mieras v. Dyncorp*, 1996–NMCA–095, ¶ 27, 122 N.M. 401, 925 P.2d 518. Thus, because the Act does not affect an important right, the only way for intermediate scrutiny to apply to Petitioners is if they belong to a sensitive class as defined by our equal protection case law.

{18} We have not previously discussed at length the standard to determine if a group of persons should be considered a sensitive class. In *Richardson v. Carnegie Library Restaurant, Inc.*, we stated that "the class of tort victims affected by the damage cap is 'sensitive' enough to the injustice wrought to warrant applying the heightened test." 107 N.M. 688, 699, 763 P.2d 1153, 1164 (1988), *overruled on other grounds by Trujillo III*, 1998–NMSC–031, ¶¶ 18–21, 32. However, our decision was based much more on the important right of access to the courts rather than the sensitive nature of the class. *Id.* We did note, however, that the definition of a suspect class justifying strict scrutiny was "a discrete group 'saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.'" *Id.* at 696, 763 P.2d at 1161 (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973)). While we believe that the definition of a suspect class for the purposes of justifying strict scrutiny is instructive for a determination of whether a group of people qualifies as a sensitive class justifying intermediate scrutiny, it is too exacting. First, for purposes of the first part of the definition from *Richardson*, the group need not be completely politically powerless, but must be limited in its political power or

ability to advocate within the political system. Second, the level of protection needed from the majoritarian political process does not have to be as extraordinary as necessary for strict scrutiny because the level of scrutiny is less in intermediate scrutiny. To assist us in determining whether a group of people should be considered a sensitive class, we will look to the analysis used by the United States Supreme Court to afford sensitive class status to certain legislative classifications. Again, when we interpret the New Mexico Constitution more broadly than the United States Constitution we rely on United States Supreme Court precedent only to the extent it is persuasive.

{19} In *United States v. Virginia*, the Supreme Court reiterated that intermediate scrutiny is applied to classifications based on gender because " 'our Nation has had a long and unfortunate history of sex discrimination.' " 518 U.S. 515, 531, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (quoting *Frontiero v. Richardson*, 411 U.S. 677, 684, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973)). For most of our Nation's history, women have been denied the same rights enjoyed by men and kept out of the political process in which women could possibly advocate for equality under the law. Systematic denial from the political process is a particularly persuasive reason to apply intermediate scrutiny, because a politically powerless group has no independent means to protect its constitutional rights. The Court noted in *United States v. Virginia*, that even after women were granted the right to vote in 1920, "it remained the prevailing doctrine that government, both federal and state, could withhold from women opportunities accorded men so long as any 'basis in reason' could be conceived for the discrimination." *Id.*

{20} The Supreme Court has also noted that even though women have made remarkable advances in the political sphere, "[n]evertheless, it can hardly be doubted that, in part because of the high visibility of the sex characteristic, women still face pervasive, although at times more subtle, discrimination in our educational institutions, in the job market and, perhaps most conspicuously, in the political arena." *Frontiero*, 411 U.S. at 686, 93 S.Ct. 1764. Thus we will apply intermediate scrutiny even though the darkest period of discrimination may have passed for a historically maligned group. Intermediate scrutiny should still be applied to protect against more subtle forms of unconstitutional discrimination created by unconscious or disguised prejudice. Thus, the courts should be sensitive to classes of people who are discriminated against not because of a characteristic that actually prevents them from functioning in society, but because of external and artificial barriers created by societal prejudice. The historical treatment of both women and persons with mental disabilities makes clear that the courts should be sensitive to classes of people who are discriminated against in this manner. *See* Laura F. Rothstein, *Disabilities and the Law* § 1.03 (2d ed.1997).

{21} In *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), the United States Supreme Court employed what can be described as an intermediate scrutiny analysis or a middle level standard of review. Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure* § 18.3, at 219, § 18.13, at 488–91 (3d ed.1999). After concluding that undocumented immigrants are not a suspect group for purposes of constitutional analysis, the Court held that children in this group are nonetheless susceptible to discrimination through legislation based on arbitrary discrimination. "If the State is to deny a discrete group of innocent children the free public education that it offers to other children residing within its borders, that denial must be justified by a showing that it furthers some substantial state interest." *Id.* at 230, 102 S.Ct. 2382. The Court appeared to rest much of its decision to afford children of undocumented immigrants this higher standard of review because they were being discriminated against "by virtue of circumstances beyond their control," which the Court held was the type of "treatment that the Fourteenth Amendment was designed to abolish." *Id.* at 217 n. 14, 102 S.Ct. 2382. These cases suggest that intermediate scrutiny is justified if a discrete group has been subjected to a history of discrimination and political powerlessness based on a character-

istic or characteristics that are relatively beyond the individuals' control such that the discrimination warrants a degree of protection from the majoritarian political process.

{22} Persons with mental disabilities have also suffered a history replete with societal discrimination and political exclusion based on a characteristic beyond their control. Justice Marshall detailed the "grotesque" history of discrimination against persons with mental disabilities in *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 461, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (Marshall, J., concurring in part, dissenting in part). Justice Marshall likened this " 'lengthy and tragic history' of segregation and discrimination" of persons with mental disabilities to "the worst excesses of Jim Crow." *Id.* at 461–62, 105 S.Ct. 3249 (quoting *Univ. of Cal. Regents v. Bakke*, 438 U.S. 265, 303, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978)). Persons with mental disabilities have been subjected to forced institutionalization and sterilization. *Id.* at 462–63, 105 S.Ct. 3249; *see also* Timothy M. Cook, *The Americans with Disabilities Act: The Move to Integration,* 64 Temp. L.Rev. 393, 399–408 (1991) (discussing the historical mistreatment of persons with disabilities). The denial of these " 'basic civil rights of man,' " *Cleburne*, 473 U.S. at 463, 105 S.Ct. 3249 (quoting *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (Marshall, J., concurring in part, dissenting in part)), was perpetuated with the acquiescence and support of government at all levels. *See* Cook, *supra.* "Government officials actively inculcated fear of persons with disabilities, particularly persons with intellectual disabilities, and directed their identification and exclusion from public services." *Id.* at 402. Many state laws declared that a person with disabilities was "unfit for citizenship" based on his or her "defect." *Id.* at 400–01. Government policies mandating segregation and institutionalization helped create and justify societal prejudice against persons with disabilities, and mental disabilities in particular. Because the government approved these discriminatory policies, societal discrimination is even more deep rooted and harder to reverse. *Id.* at 407–08.

{23} The Findings and Purpose section of the Americans with Disabilities Act contains language that further describes the historical mistreatment of persons with mental disabilities and their exclusion from the political process.

The Congress finds that—

. . .

(2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;

(3) discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services;

(4) unlike individuals who have experienced discrimination on the basis of race, color, sex, national origin, religion, or age, individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination;

(5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, . . . overprotective rules and policies, . . . exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, . . . benefits, . . . or other opportunities;

(6) census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally;

(7) individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly

indicative of the individual ability of such individuals to participate in, and contribute to, society;

(8) the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals; and

(9) the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity.

Americans with Disability Act, 42 U.S.C. § 12101.

{24} Although this language was directed at all persons with disabilities, we note that "[e]ven within the disability community, persons with mental illness are often the poor stepchild, and remain the last hidden minority." Michael L. Perlin, *The ADA and Persons with Mental Disabilities: Can Sanist Attitudes Be Undone?*, 8 J.L. & Health 15, 20 (1993–94). "Surveys show that mental disabilities are the most negatively perceived of all disabilities." Michael L. Perlin, *"Their Promises of Paradise": Will Olmstead v. L.C. Resuscitate the Constitutional "Least Restrictive Alternative" Principle in Mental Disability Law?*, 37 Hous. L.Rev. 999, 1032–33 (2000) (noting that mentally disabled individuals are denied jobs, housing, and publically funded programs based on behavioral myths that suggest they are deviant, strange, disproportionately dangerous, and presumptively incompetent).

{25} We note that Congress and the New Mexico Legislature have enacted laws to ensure better living standards for those with mental disabilities. These laws show the continuing need that mentally disabled persons have for protection from societal discrimination. While some legislation may recognize the need to affirmatively protect persons with mental disabilities, this group-chiefly because of its history of invidious discrimination-is nonetheless susceptible to the type of baseless stereotyping that has

motivated and perpetuates the more subtle forms of gender-based classifications.

{26} Federal legislation attempting to remove discrimination against persons with mental disabilities includes the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400–1491 (2002) ("IDEA"), which aims "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." *Id.* at § 1400(d)(1)(A). Under IDEA, states that receive federal educational funding must offer procedural safeguards to help ensure the education of the special needs child. *Id.* at § 1415(a). The IDEA requires that schools and parents develop an individualized education program ("IEP") as a tool to enforce compliance with the free appropriate education requirement. *See id.* §§ 1401(11), 1414(d). Additionally, the Mental Health Parity Act mandates parity in insurance coverage to raise mental health coverage to the same level as physical disability coverage in certain situations. 42 U.S.C. § 300gg–5 (2000). These federal laws show an increased awareness on the part of Congress that persons with disabilities, and mental disabilities more specifically, must be afforded a measure of protection from societal discrimination.

{27} In recent history, New Mexico has been at the forefront of affording greater protection for the mentally disabled. In our recent decision of *State v. Flores*, 2004–NMSC–021, ¶ 13, 135 N.M. 759, 93 P.3d 1264, we noted the characteristics of mentally retarded criminal defendants that could potentially prejudice their trial and the need for procedural rules to minimize those risks. Further, New Mexico was one of the first states to define the "least drastic means principle," or "least restrictive alternative concept," for purposes of involuntary civil commitment. *See* NMSA 1978, § 43–1–3; *see also* Perlin, *"Their Promises of Paradise"*, *supra*, at 1017. Therefore, New Mexico has continually shown a concern for protecting the mentally disabled against possible discrimination.

{28} Based on our development of New Mexico's Equal Protection Clause, it is ap-

propriate to apply intermediate scrutiny to classifications based on mental disability because such persons are a sensitive class. The historical discriminatory treatment of persons with mental disabilities shows that the courts should be sensitive to possible discrimination against persons with mental disabilities contained in legislation that purports to treat them differently based solely on the fact that they have a mental disability.

{29} Finally, we are not basing our decision to consider persons with mental disabilities a sensitive class for purposes of equal protection on any notion that such persons cannot advocate for themselves in the political process. To the contrary, persons with mental disabilities and their political allies are active participants in the political process. However, their effective advocacy is seriously hindered by the need to overcome the already deep-rooted prejudice against their integration in society. The gains in societal acceptance and political advocacy made by the disability rights movement today could easily be reversed through discriminatory laws in the future. Just as classifications based on gender continue to warrant a heightened scrutiny even though women have become much more integrated into the political arena in recent decades, *see Frontiero*, 411 U.S. at 686, 93 S.Ct. 1764, similar gains by persons with mental disabilities do not obviate the need for heightened scrutiny to examine legislation that draws distinctions based on mental disabilities.

## C. Intermediate Scrutiny in New Mexico

 {30} The previous section described when intermediate scrutiny should be applied to legislation challenged under equal protection. We now discuss how intermediate scrutiny analyzes challenged legislation in New Mexico. Challenged legislation will be upheld if the classification is substantially related to an important government interest. *See, e.g., Marrujo v. N.M. State Highway Transp. Dep't*, 118 N.M. 753, 757, 887 P.2d 747, 751 (1994). "Therefore, when applying intermediate scrutiny, this Court must examine (1) the governmental interests served by the [legislative classification], and (2) whether the classifications under the statute bear a

substantial relationship to any such important interests." *Corn v. New Mexico Educators Fed. Credit Union*, 119 N.M. 199, 211, 889 P.2d 234, 246 (Apodaca, J., Specially Concurring), *overruled on other grounds by Trujillo III*, 1998–NMSC–031, ¶ 32. The burden is on the party supporting the legislation's constitutionality. *Marrujo*, 118 N.M. at 757, 887 P.2d at 751. The party supporting the constitutionality of the legislation must show that the discriminatory legislative classification is based on a "reasoned analysis rather than through the mechanical application of traditional, often inaccurate, assumptions." *See Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 726, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982).

{31} We balance the importance of the government interest against "the burdens imposed on the individual and on society." *See Trujillo I*, 110 N.M. at 629, 798 P.2d at 579 (internal citation omitted). This can be accomplished by analyzing the overall purpose of the legislation at issue. The legislative goals, or what the legislation attempts to remedy or provide, will help to determine if the governmental interest is substantially related to the classification drawn. *Id.* at 630, 798 P.2d at 580. It will also allow the court to compare how the legislative classification treats the sensitive class vis-à-vis others similarly situated. The Court can better determine how heavily the sensitive class is burdened depending on how other persons similarly situated are treated by the legislation.

 {32} In examining whether there is a substantial relationship between the important governmental interests and the classifications drawn, the court will employ a least restrictive alternative analysis. However, this examination is not as exacting as would be used in strict scrutiny. "Intermediate scrutiny, while allowing for a more flexible accommodation of legislative purposes than strict scrutiny, does not abandon totally the concern with over- and under-inclusiveness that, under strict scrutiny, is given form as the least restrictive alternative test." *Trujillo I*, 110 N.M. at 629, 798 P.2d at 579. Further, "[w]hile the 'least restrictive alternative' need not be selected if it

poses serious practical difficulties in implementation, the existence of 'less restrictive alternatives' is material to the determination of whether the classification substantially furthers an important governmental interest." *Id.* at 630, 798 P.2d at 580.

## II. Application of Intermediate Scrutiny to Sections 52–1–41 and –42

{33} Respondents argue that the governmental interest in treating mentally impaired workers differently is to protect the financial viability of Workers' Compensation. This has previously been recognized as a proper goal for legislation and it is surely an important interest. *See Candelaria v. Gen. Elec. Co.,* 105 N.M. 167, 174, 730 P.2d 470, 477 (Ct.App.1986), *superceded by statute as stated in Jensen v. N.M. State Police,* 109 N.M. 626, 628, 788 P.2d 382, 384 (Ct.App. 1990). They argue that limiting mental disability compensation to 100 weeks, while allowing lifetime compensation for physical disability, will prevent fraudulent claims of mental disability. Additionally, they argue that claims involving mental disabilities are harder to diagnose and are more susceptible to fraudulent claims.

{34} It is certainly important to keep Workers' Compensation financially sound. "However, a determination that the classification is aimed at furthering an important governmental interest does not necessarily imply that the classification is 'substantially related' to the interest so identified." *Trujillo I,* 110 N.M. at 628, 798 P.2d at 578.

{35} Because there is an important governmental interest at stake in this case, the only determination we need to make is whether the challenged classification is substantially related to that important interest. *See Corn,* 119 N.M. at 211, 889 P.2d at 246 (Apodaca, J., Specially Concurring). Again, to make this determination we will look to the purposes of the Act to determine the burdens imposed on Petitioners and analyze whether there are other less restrictive means of accomplishing the governmental interest.

{36} The Act is intended "to provide a humanitarian and economical system of compensation for injured workmen." *Graham v.*

*Wheeler,* 77 N.M. 455, 457, 423 P.2d 980, 981 (1967), *abrogated on other grounds by* NMSA 1978, § 52–5–1 (1990). Our Court of Appeals has stated that the Act "is the result of a legislative balancing involving the subjection of employers to liability without fault for work-related injuries suffered by workers, with a limitation restricting other actions against employers under the exclusivity provisions contained therein." *Mieras,* 1996–NMCA–095, ¶ 30. The Act is designed to provide quick and reliable recovery for injured workers while at the same time protecting society by shifting the burden of caring for injured workers away from society and toward industry. *Id.* In this way, the Act is intended to "prevent the worker from becoming a public charge and to assist the worker in returning to work with minimal dependence on compensation awards." *Madrid,* 1996–NMSC–064, ¶ 12.

{37} Compensation for a disability under the Act is for the impairment in capacity to perform work suffered by the worker, or lost earning capacity. It is not simply an award for an injury. *See Shores v. Charter Servs., Inc.,* 112 N.M. 431, 432, 816 P.2d 500, 501 (1991); *see also Medina v. Zia Co.,* 88 N.M. 615, 544 P.2d 1180 (Ct.App.1975). NMSA 1978, Section 52–1–20 (1990) orders compensation to be determined by the worker's average weekly wage and how much it has been reduced by the injury. The main goal is not to punish or allocate blame for the injury, but to compensate a worker for lost earning capacity without burdening the social welfare system. How the disability was caused ceases to be important once a worker has been determined to have suffered a compensable disability.

{38} The Act is also Petitioners' only available remedy. The Act is designed to be the exclusive remedy for participating workplace accidents. *See* NMSA 1978, § 52–1–9 (1973); *see, e.g., Morales v. Reynolds,* 2004–NMCA–098, ¶ 6, 136 N.M. 280, 97 P.3d 612 ("the benefits and remedies provided [in the Act] are the exclusive remedy for that employer's workers who are injured or killed in accidents 'arising out of and in the course of' their employment."); *cf. Delgado v. Phelps*

*Dodge Chino, Inc.*, 2001–NMSC–034, ¶ 24, 131 N.M. 272, 34 P.3d 1148 ("[W]hen an employer intentionally inflicts or willfully causes a worker to suffer an injury that would otherwise be exclusively compensable under the Act, that employer may not enjoy the benefits of exclusivity, and the injured worker may sue in tort."). This exclusivity provision is the keystone of the compromise in the workers compensation system: "an injured worker gives up his or her right to sue the employer for damages in return for an expedient settlement covering medical expenses and wage benefits, while the employer gives up its defenses in return for immunity from a tort claim." *Morales,* 2004–NMCA–098, ¶ 6.

{39} Sections 52–1–41 and –42 limit the basic benefits of the Act for persons with mental disabilities. The limitation on compensation contained in those sections hamstrings Petitioners' ability to receive adequate compensation and return to work in a different capacity. Petitioners can only receive 100 weeks of compensation, while a worker who suffers a non-scheduled physical injury receives 500 to 700 weeks of compensation if the injury is partial and permanent or lifetime compensation if the injury is total and permanent. *See* §§ 52–1–41 and –42. Thus, at best, a mentally disabled worker can only receive one-fifth the compensation of a physically disabled worker. Additionally, any temporary total compensation a worker receives prior to Maximum Medical Improvement ("MMI") will be deducted from his or her permanent partial compensation. § 52–1–42(B). If the worker is totally disabled for over 100 weeks with a primary mental impairment, he or she will receive no permanent partial compensation at all. Therefore, mentally disabled workers are burdened with severely less time to transition into a job that is not compromised by their disability.

{40} Because Respondents point to the potential for fraud as a rationale for the disparity in benefits, we next analyze whether there are alternative ways to address possible fraudulent claims while posing less of a burden to Petitioners and other workers with compensable mental disabilities. The Act already contains several mechanisms to prevent fraudulent claims. The most obvious is the narrow definition of primary mental impairment, as contained in *See* Section 52–1–24(B):

> a mental illness arising from an accidental injury arising out of and in the course of employment when the accidental injury involves no physical injury and consists of a psychological traumatic event that is generally outside of a worker's usual experience and would evoke significant symptoms of distress in a worker in similar circumstances, but is not an event in connection with disciplinary, corrective or job evaluation action or cessation of the worker's employment.

This definition is purposefully narrow in scope so that it covers only mental illnesses that arise from a specific and definite occurrence, and not mental illnesses that develop gradually over time and are more difficult to determine if they are related to employment. *See Jensen v. N.M. State Police,* 109 N.M. 626, 629, 788 P.2d 382, 385 (Ct.App.1990). This amounts to a permissible proof requirement. *See Holford v. Regents of Univ. of Cal.,* 110 N.M. 366, 368, 796 P.2d 259, 261 (Ct.App.1990). These proof requirements are a valid way to prevent fraudulent claims from being compensated in the first place.

{41} Beyond the narrow definition of a primary mental impairment, the Legislature has provided additional means of preventing fraud in awarding compensation benefits under the Act. The New Mexico Workers' Compensation Administration is authorized to dismiss a claim or otherwise punish a worker if it determines a claim was fraudulent. *See* NMSA 1978, § 52–1–28.1 (1990) (addressing unfair claims practices and bad faith); *see also* NMSA 1978, § 52–1–28.3 (1990) (addressing false statements or representations with regard to physical condition); NMSA 1978, § 52–1–51(I) (1990) (addressing in part unsanitary or injurious practices); 11 NMAC 4.1.7.C (defining bad faith); 11 NMAC 4.5.1 – .18 (addressing the enforcement power of the Administration to penalize fraudulent claims); *Varbel v. Sandia Auto Elec.,* 1999–NMCA–112, 128 N.M. 7, 988 P.2d 317. These procedures are used within an adversarial process so that each party has an

interest in exposing the other's possible fraud.

{42} The Act provides that both the employer and employee may choose a health care provider to evaluate and treat the employee claiming a disability. *See* NMSA 1978, § 52–1–49 (1990). These health care providers may then offer testimony when a mental disability is claimed. The chances of fraud are diminished when multiple doctors examine the employee, offer their opinions about the disability and are cross-examined.

{43} Finally, WCJs are trained to handle cases of mental impairment or disability. Along with the procedures described above, the WCJ is in a position to weigh all the evidence presented by both sides and come to an accurate determination of the case. A good example of how the system works is presented in this case, as Petitioners' mental disabilities did arise from a specific event and were held to be properly compensable under Section 52–1–24(B) by both the WCJ and the Court of Appeals. *See Carrasco,* No. 20,-833/20,832 (N.M.Ct.App. May 29, 2001) (consolidated). Indeed, Respondents do not contest that Petitioners suffered a valid and compensable disability under the Act on this appeal.

{44} All of these valid mechanisms are less restrictive means to prevent fraud than arbitrarily limiting the amount of compensation for persons with mental impairments. In fact, the rest of the Act shows that the Legislature knows how to prevent fraudulent claims without arbitrarily restricting one group's access to benefits it otherwise deserves under the Act. Respondents have not demonstrated why these less restrictive means are ineffective or inadequate to control fraudulent claims without also imposing an arbitrary limit of 100 weeks.

{45} Respondents also argue that mental disability claims are inherently more difficult to diagnose than physical injuries. They argue that caps are needed on recovery for mental disabilities to compensate for the uncertainty in diagnosis. While there is perhaps more uncertainty in diagnosing a mental disability than a physical disability, we are not convinced this is a sufficiently substantial concern to justify the disparate treatment at issue here. First, the provisions of the Act discussed above aimed at preventing fraud also help the WCJ consider the claim and correctly determine if compensation is appropriate. Second, in *Smith v. Cutler Repaving,* 1999–NMCA–030, ¶ 13, 126 N.M. 725, 974 P.2d 1182, our Court of Appeals reversed a WCJ's determination that a worker had reached MMI on his secondary mental impairment, even though it affirmed the WCJ's determination that the worker reached MMI on his physical impairment. The court first noted that MMI turns on a determination of "reasonable medical probability of future recovery and lasting improvement." *Id.* ¶ 12. Then the court analyzed the medical testimony regarding the chances for improvement of the worker's mental disability. The court held that the testimony did not indicate a reasonable probability that the worker had recovered from his mental disability. Thus, it is possible for a WCJ to determine when and if a worker has reached MMI due to a mental impairment and also for an appellate court to review that determination.

{46} We also note that the definition of total disability includes a brain injury that results in "a permanent impairment of thirty percent or more." *See* § 52–1–25(A)(2). As Amicus New Mexico Trial Lawyers Association pointed out, brain injuries, or closed head injuries, share similar symptoms and diagnosis concerns as mental disabilities. Thus, the Legislature has shown a willingness to give compensation to brain injuries that are subject to similar criticism as mental disabilities.

{47} Respondents also argue that allowing mental disability claims to be equalized with physical disabilities will possibly harm the financial viability of the Act. Basically, they argue that the cap is necessary to hold down costs. Again, we agree that preserving the financial viability of workers' compensation is important. However, we agree with Petitioners that the 100 week cap only limits fraudulent recovery to 100 weeks. Limiting fraudulent claims in this manner must be balanced against the severe burden it places on workers with legitimate mental disabilities.

{48} We agree with Petitioner that the disparity between the compensation granted to workers who suffer physical injuries and those who suffer mental injuries is not substantially related to the important government interests alleged. The Act is designed to compensate a worker's diminished capacity to earn because of an accidental injury on the job. This protects New Mexico's social welfare system and rightly shifts the burden of protecting workers onto industry. With all of the procedural safeguards against fraud built into the system, severely limiting compensation for mental injuries does not substantially further these goals. The limits impinge on a mentally disabled worker's ability to take advantage of the rights afforded to him or her under the Act. *See Plyer,* 457 U.S. at 221–22, 102 S.Ct. 2382 (noting that "one of the goals of the Equal Protection Clause ... [is] the abolition of governmental barriers presenting unreasonable obstacles to advancement on the basis of individual merit.").

{49} As Petitioner argues, Section 52–1–25.1 defines *all* total temporary disabled workers as those who cannot perform their duties until they have reached MMI. The idea that mentally disabled workers are less entitled to recover compensation than physically disabled workers does not fit with the purpose of the Act. Under the Act, both mentally disabled workers and physically disabled workers are impaired in their capacity to perform work because of their disabilities. A mental disability, compensable under the Act, affects workers in the same way as a physical disability does: it prevents them from earning a wage because of an on-the-job accident.

**CONCLUSION**

{50} We conclude that limiting the compensation for mentally disabled workers compared to physically disabled workers is not substantially related to furthering the purposes and goals of the Act. For the foregoing reasons, we hold that Sections 52–1–41 and –42 violate equal protection by discriminating against the mentally disabled in violation of equal protection guarantees. We order that the duration of compensation for primary mental and physical impairments under Sec-

tions 52–1–41 and –42 be treated equally for purposes of benefit compensation and remand for proceedings consistent with this opinion.

{51} **IT IS SO ORDERED.**

BOSSON, C.J., SERNA and CHÁVEZ, JJ., concur.

MINZNER, J. (dissenting).

MINZNER, Justice (dissenting).

{52} I respectfully dissent. I would affirm the Court of Appeals, which held that the Workers had established neither a constitutional nor a statutory violation, *see Breen v. Carlsbad Mun. Sch.,* 2003–NMCA–058, ¶ 1, 133 N.M. 618, 67 P.3d 908, and that the Workers' Compensation Judge (WCJ) did not err in refusing to enforce the initial compensation orders after they were affirmed on appeal. *Id.* ¶ 6. In those orders, the WCJ had granted temporary total disability benefits pursuant to NMSA 1978, § 52–1–25.1 (1990), without limitation. In refusing to enforce those orders on remand, the WCJ effectively limited Workers to one hundred weeks of benefits, consistent with NMSA 1978, § 52–1–41(B) (1999).

{53} In Section 52–1–25.1, which provides for temporary total disability, the Legislature did not limit the number of weeks a worker may receive benefits. Rather, the Legislature defined the term "temporary total disability" as "the inability of the worker, by reason of accidental injury arising out of and in the course of employment, to perform his [or her] duties prior to the date of his [or her] maximum medical improvement." Section 52–1–25.1(A). The Legislature has defined " 'the date of maximum medical improvement' " as "the date after which further recovery from or lasting improvement to an injury can no longer be reasonably anticipated based upon a reasonable medical probability." NMSA 1978, § 52–1–24.1 (1990). The WCJ's initial orders indicated that neither Worker had reached maximum medical improvement.

{54} The Court of Appeals reasoned that the WCJ did not err in limiting the awards to one hundred weeks, notwithstanding the ab-

sence of a limitation in Section 52–1–25.1, because Section 52–1–41(B) provides a maximum period of compensation of one hundred weeks. *See Breen*, 2003–NMCA–058, ¶ 6. The Court of Appeals described the statute as limiting "the period of compensation for total disability resulting from primary mental impairment." *Id.* The Legislature applied the same limitation to compensation for permanent partial disability resulting from a primary mental impairment, *see* NMSA 1978, § 52–1–42(A)(3) (1990), and provided that this limitation includes compensation awarded for temporary total disability. Section 52–1–42(B). Workers' arguments on appeal arise out of Section 52–1–25.1 but implicate both Sections 52–1–41(B) and 52–1–42(A)(3), although Workers actually challenge only the limitation on the number of weeks they are entitled to receive benefits for temporary total disability.

{55} Workers' arguments on appeal do not distinguish the protection provided by the federal constitution from that provided by the state constitution. Workers also do not argue that they are part of a sensitive or suspect class. Under these circumstances, I would not attempt to distinguish the equal protection guaranteed by the New Mexico Constitution from that guaranteed by the federal constitution. *Cf. State v. Gomez*, 1997–NMSC–006, ¶ 19, 122 N.M. 777, 932 P.2d 1 (describing the analysis that is appropriate in interpreting the New Mexico constitution differently than the federal constitution).

{56} I do think it is difficult to determine how to analyze the statutes Workers challenge. It is difficult to determine whether we should view workers with primary mental impairments as similarly situated to workers with physical impairments, and it is difficult to determine whether the differences within the statutes reflect "subtle forms of unconstitutional discrimination created by unconscious or disguised prejudice." *See* Maj. Op., ¶ 20. I am persuaded, however, that the differences serve an important and legitimate governmental interest and that the WCJ properly applied the law to the facts.

{57} The Legislature has created a scheme of workers' compensation that classifies most work-related injuries by the degree of impairment. The Legislature has defined impairment as "an anatomical or functional abnormality existing after the date of maximum medical improvement as determined by a medically or scientifically demonstrable finding and based upon the most recent edition of the American medical association's guide ['AMA Guide'] to the evaluation of permanent impairment or comparable publications of the American medical association." NMSA 1978, § 52–1–24(A) (1990). The legislation compensates more generously those injuries that result in a higher degree of impairment than those injuries that result in a lesser degree of impairment. *See, e.g.,* § 52–1–42(A)(1), (2) (distinguishing compensation for permanent partial disability when a worker has a "percentage of disability" that is "equal to or greater than eighty" and when a worker has a "percentage of disability" that is less). Workers who suffer an injury to a specific body member recover according to a schedule, which provides fewer than one hundred weeks compensation for many injuries. *See* NMSA 1978, § 52–1–43 (2003). Workers who suffer a "primary mental impairment" are distinguished from those who suffer a "secondary mental impairment." *See* § 52–1–42(A)(3), (4); § 52–1–24(B), (C). Permanent total physical disability is narrowly defined. *See* NMSA 1978, § 52–1–25(A) (2003) (including within the term "the permanent and total loss or loss of use of both hands or both arms or both feet or both legs or both eyes or any two of them").

{58} The compensation limitations within this scheme arise primarily from the capacity of medical providers to determine the percentage of disability or degree of impairment the statutory classifications describe. The Legislature has directed a WCJ to rely upon the AMA Guide in making those determinations. *See* § 52–1–24(A). We have held that Section 52–1–24(A) is neither an unconstitutional delegation of the Legislature's authority nor a violation of due process and equal protection. *See Madrid v. St. Joseph Hosp.* 1996–NMSC–064, ¶ 1, 122 N.M. 524, 928 P.2d 250. The statutory classifications reflect a trend toward objective determinations of physical injuries. *See generally* Carlos G. Martinez, *"Selected Issues in Workers' Com-*

*pensation Laws,"* in Mark D. Jarner et al., *Advanced Workers' Compensation in New Mexico* 3 (2000) (describing the 1991 Legislature as seeking "a more objective formula for the definition of disability"). The distinction between benefits for a worker with a work-related mental impairment and a worker with a work-related physical impairment under the present compensation scheme probably reflects the lack of consensus on how to determine the percentage of disability for mental impairment after maximum medical improvement. *See* David L. Skinner, *"Medical Issues and Their Role in the Complex Workers' Compensation Claim,"* in Jarner et al., *supra,* 36–37.

{59} For example, the AMA Guide does not provide a method to determine the degree of mental impairment. The Guide notes that "there are no precise measures of impairments in mental disorders. The use of percentages implies a certainty that does not exist.... [T]he authors are unaware of data that show the reliability of the impairment percentages." American Medical Association, *Guides to the Evaluation of Permanent Impairment* § 14.3, 361 (5th ed.2001). The AMA Guide lists factors to be considered in determining the severity of a mental impairment, *id.* § 14.4, 364, and uses "[t]he term remission, rather than cure ... to indicate an individual's improvement." *Id.* The AMA Guide refers readers to a diagnostic manual of mental disorders, *id.* § 14.2, 359, and that manual suggests "the majority of disorders" may be characterized as mild, moderate, or severe and as in partial or full remission. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 2 (4th ed.1994). Thus, while it is clear that mental impairments exist, the AMA Guide, on which the Legislature apparently relied in creating the present scheme of workers' compensation, does not assist courts in determining the degree or permanence of such impairments. In providing a limitation of one hundred weeks for benefits for permanent partial disability arising from a primary mental impairment, the Legislature may have taken into account the possibility of an extended period of temporary total disability for a primary mental impairment.

{60} Temporary total disability compensates a worker while he or she cannot work or until maximum medical improvement. The Legislature apparently envisioned a relatively short period of time. A worker with a scheduled injury is entitled to receive compensation for such an injury in addition to compensation for temporary total disability. *See* Section 52–1–43(D). The Legislature may have envisioned temporary total disability benefits as providing for a worker until he or she could be evaluated for permanent partial disability or compensation for a scheduled injury. The AMA Guide indicates the time at which a worker with a primary mental improvement reaches maximum medical improvement may be difficult to determine. See AMA Guide, § 14.4, 364 (using the term remission rather than cure). Under these circumstances, a worker who receives temporary total disability benefits for a primary mental impairment may receive those benefits longer than a worker who suffers a scheduled injury or a physical injury. In providing a limitation of one hundred weeks for temporary total disability, the Legislature seems to me to have provided a limitation consistent with current medical knowledge and the goal of consistent, objective determinations.

{61} Consistent and objective determinations reached in reliance on current medical knowledge seem to have been within the Legislature's intent. *See* NMSA 1978, § 52–5–1 (1990) (noting the Legislature's interest in "the quick and efficient delivery of" benefits "at a reasonable cost"). Current medical knowledge distinguishes physical and mental impairments in such a way that consistent and objective determinations of mental impairments appear to be more difficult to obtain than consistent and objective determinations of physical impairments. I do not believe that makes the scheme unconstitutional. Workers with physical impairments may not be similarly situated to workers with mental impairments under this scheme. The limitation of one hundred weeks for permanent partial disability seems to me to reflect a concern that for workers with primary mental impairments the definition of temporary total disability in fact provides a more consistent and objec-

tive determination of capacity to work than the concept of permanent partial disability. Further, the scheme seems to make costs more predictable by relying on objective, consistent determinations.

{62} New Mexico is not alone in attempting to accommodate mental injuries within a scheme that developed when manufacturing and agriculture occupied more workers and work-related mental injuries may have been less common and probably were less understood. Nationally, workers' compensation systems are evolving in their treatment of mental impairments. 3 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* §§ 56.04, 56.06 (2004). Fifteen states do not compensate certain mental injuries at all. *Id.* § 56.06[4]. States that do compensate such injuries limit benefits in a number of ways. *Id.* §§ 56.06[1], [5], [6]. A durational limitation on compensation benefits for mental impairments seems to me to be a good illustration of the principle that in tackling a problem, such as adjusting a complex scheme to changing economic and social conditions, the Legislature need not proceed to solve it all at once. *Cf. Kolton v. County of Anoka,* 645 N.W.2d 403, 411–13 (Minn.2002) (upholding, against an equal protection challenge under both federal and state constitutions, a two-year limitation on benefits under a long-term disability plan for disabilities due to mental illness).

{63} A majority of the Court being of a different view, I respectfully dissent. I believe we disagree not on the proper treatment of legislation that discriminates on the basis of mental disability but rather on how to classify the legislation Workers challenge.