**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: _____

Filing Date: January 3, 2018

Docket No. A-1-CA-34523

JOHNNY A. GABRIELE,

       Petitioner-Appellant,

v.

DEBORRAH L. GABRIELE, a/k/a
DEBBIE GABRIELE,

       Respondent-Appellee.

**APPEAL FROM THE DISTRICT COURT OF COLFAX COUNTY**
**Sarah C. Backus, District Judge**

Michael Danoff & Associates, P.C.
Michael L. Danoff
Albuquerque, NM

for Appellant

Kamm & McConnell, L.L.C.
Terrence R. Kamm
Raton, NM

for Appellee

**OPINION**

**HANISEE, Judge.**

**{1}** Husband appeals the district court's division of property that resulted from the parties' dissolution of marriage. Specifically, Husband contends the district court erred by failing to distribute all property and finding that four sole and separate property agreements that Husband signed shortly before Husband filed for divorce were valid. For the reasons discussed below, we affirm in part, reverse in part, and remand for further proceedings.

1

**BACKGROUND**

**{2}** Johnny Gabriele (Husband) and Deborrah Gabriele (Wife) were married on February 15, 2006. Husband filed a petition for divorce on July 22, 2013. A trial was held to determine how the marital property would be divided, after which the parties submitted proposed findings of fact and conclusions of law. The district court issued its decision and order in which it granted dissolution of the parties' marriage and distributed the marital property, including real estate, cash, other assets, and liabilities.

**{3}** Husband appealed and makes the following claims: (1) the district court erred by concluding that the sole and separate property agreements (SSPAs) that Husband signed were valid, enforceable contracts; (2) the district court erred in its distribution of the parties' marital residence—known as the Francis Home—which Husband had acquired prior to marriage; and (3) the district court failed to address Husband's claimed interests—both separate and community—in various other property, including a 1955 Chevrolet that Wife had given him as a birthday gift, a property located in Texas (the Texas property), and Wife's income earned during the marriage. We address each of Husband's claims in turn, reserving discussion of more specific facts when pertinent to our legal analysis.

**I.      Whether the Four SSPAs Are Valid, Enforceable Contracts**

**A.      Additional Facts**

**{4}** In 2007, Wife—who had a background as a nursing home administrator and a Master's degree in business—started an assisted living business called Colfax Senior Care, LLC (CSC), a limited liability company (LLC) in which Wife was the single registered member. CSC purchased a residential property (262 Francis) out of which to operate an assisted living facility for $92,000. Wife testified that the "start-up money" for CSC came from $50,000 of her separate savings and a $20,000 loan from her children. Husband testified that he contributed $29,000 from his smaller retirement fund for the down payment on 262 Francis and that he participated in the business by helping to remodel and maintain the facility. Wife disputed that Husband contributed any funds to purchase 262 Francis. The district court resolved this dispute in Husband's favor, finding that Husband "contributed approximately $29,000 of his separate funds to [the] purchase [of 262 Francis]."

**{5}** CSC was expanded in 2009-10 in order to meet growing demand in the community, and the business purchased a lot (251 Francis) on which to construct a new, larger facility. Both parties agree that Husband contributed $10,000 from his retirement savings to purchase 251 Francis and loaned CSC $80,000 to construct the new facility. CSC took out a $528,000 bank loan to finance the remainder of the construction project. 262 Francis was sold after 251 Francis opened.

**{6}** In July 2012, Wife started making plans to expand the business again, including

2

construction of a new, $1.5 million facility. According to Wife, when she discussed her expansion plans with Husband, he was "adamant that [she] not do it" because he was concerned about "[s]o much liability[,]" both financial and legal. Wife consulted a business lawyer about forming a new LLC for the expanded business that could be Wife's separate property in order to release Husband from all liability associated with the new business. The lawyer helped Wife "draw up the new LLC" and informed her that she "could create a document" that would put "all the liability, financial, legal" on Wife. Wife testified that Husband was "very pleased that there was . . . a way that we could both have what we wanted. It was a good compromise."

{7}     On April 25, 2013, the parties signed four SSPAs. In addition to two SSPAs designating, respectively, the new LLC (Colfax Senior Living, LLC (CSL)) and the property for the new facility (the State Street property) as the separate property of Wife, there were two SSPAs that designated CSC (the existing LLC) and 251 Francis (the existing assisted living facility) as Wife's separate property. The SSPAs provided that Husband "expressly waives, relinquishes, and releases any and all right, title, claim, or interest in and to" both pieces of real property as well as the LLCs' "Membership Interest." After Husband and Wife signed the SSPAs, Wife continued with the development of CSL.[1] She purchased the State Street property in May 2013 for $120,000 with money from "[her] business" and two bank loans. However, once divorce proceedings commenced in July 2013, Wife decided not to go forward with the expansion project.

{8}     At the time of trial, CSC was under contract for sale for $620,000. Subsequent to trial, after the sales transaction was completed and CSC's debts were paid off, $257,461.26 was placed in the registry of the court. Regarding CSL, Wife testified that she believed the plans for the State Street project that she had commissioned were sellable but that she was not aware of anyone who was interested in purchasing the project. She also described CSL's outstanding debts, but the district court did not make any specific findings or conclusions regarding the amount of those debts.

{9}     Husband argued to the district court that he "received no consideration" under the SSPAs, thereby invalidating them, and that Wife "breached her fiduciary duty to [Husband] by her conversion of community property to her sole and separate property." Wife contended that "[t]he consideration for the [SSPAs] was to free [Husband] of all liability and debt associated with the business then and in the future, which was considerable." The district court found that Husband "desired to be relieved of responsibility for existing debt and liability of both companies, and future debt and liability of the businesses and the property" and concluded that "[b]y signing the agreements [Husband] was relieved of responsibility

---

[1]The record does not specify CSL's date of creation.

for the debt as well as the liability."[2] As such, the district court awarded Wife, among other things, 251 Francis, the State Street property, CSL and its assets, and CSC—including the entire $257,461.26 of proceeds from the sale of CSC—all subject to debt thereon.

**B.      Analysis**

{10}     Husband relies on general principles of contract law and argues that the district court erred in concluding that the SSPAs are valid because (1) they lacked mutual assent, and (2) Wife's promise of releasing Husband from liability was illusory, thus they also lacked valid consideration. Wife relies on the definition of "separate property" contained in NMSA 1978, Section 40-3-8 (1990), to support the validity of the designation of the businesses and properties identified in the SSPAs as Wife's separate property.[3] Neither party has addressed the import of NMSA 1978, Section 40-2-2 (1907), wherein the Legislature statutorily set forth the contract rights of married persons. We begin with the statute. *See Hughes v. Hughes*, 1981-NMSC-110, ¶ 19, 96 N.M. 719, 634 P.2d 1271 ("In New Mexico, transactions between husbands and wives are governed by Section 40-2-2[.]"); *Primus v. Clark*, 1944-NMSC-030, ¶ 13, 48 N.M. 240, 149 P.2d 535 (explaining that "[t]ransactions between husband and wife are controlled by the . . . statute" and analyzing the challenged agreement within the context of the statute).

**1.      Section 40-2-2: Contract Rights of Married Persons**

{11}     In New Mexico, "[e]ither husband or wife may enter into any engagement or transaction with the other, or with any other person respecting property, which either might, if unmarried[.]" Section 40-2-2. However, such transactions between spouses are subject to

---

[2]The district court made these findings in its amended decision and order as a result of this Court's order of limited remand for entry of detailed findings of fact concerning whether each of the four SSPAs was supported by consideration.

[3]As this Court has previously explained, Section 40-3-8 merely "deals with classes of property and not with how property may be changed to a different class." *Estate of Fletcher v. Jackson*, 1980-NMCA-054, ¶ 45, 94 N.M. 572, 613 P.2d 714; *see* § 40-3-8(A)(5) (defining one type of "separate property" as "property designated as separate property by a written agreement between the spouses, including a deed or other written agreement concerning property held by the spouses . . . [,] in which the property is designated as separate property"). Wife fails to explain how coming within the statutory classification of "separate property" alone renders the SSPAs—which attempted to transmute community property to separate property—valid, enforceable contracts. To the extent Wife argues that Section 40-3-8(A)(5) is dispositive of the question whether the properties identified in the SSPAs are Wife's separate property, we reject such argument as unsupported by any authority. *See Curry v. Great Nw. Ins. Co.*, 2014-NMCA-031, ¶ 28, 320 P.3d 482 ("Where a party cites no authority to support an argument, we may assume no such authority exists.").

4

"the general rules of common law which control the actions of persons occupying confidential relations with each other." *Id.* Interpreting this statute, our Supreme Court has held that transactions between spouses in which one spouse "secured a decided advantage over the [other]" are "presumptively fraudulent." *Beals v. Ares*, 1919-NMSC-067, ¶¶ 73, 82, 90, 25 N.M. 459, 185 P. 780. That is because a husband and wife are fiduciaries upon whom are imposed " 'the obligation of exercising the highest good faith towards [each other] in any dealing between them, and [which] preclude[s each] from obtaining any advantage over [the other] by means of any misrepresentation, concealment, or adverse pressure.' " *Id.* ¶ 76 (quoting with approval *Dolliver v. Dolliver*, 30 P. 4, 5 (Cal. 1892) (in bank)); *see Primus*, 1944-NMSC-030, ¶ 15 (explaining that the statute governing the contract rights of married persons "creates in law a fiduciary relationship between husband and wife"). In such cases, in order to overcome the presumption of fraud, it is the duty of the spouse who has gained the advantage "to show (a) the payment of an adequate consideration, (b) full disclosure by him [or her] as to the rights of the [other] and the value and extent of the community property, and (c) that the [other] had competent and independent advice in conferring the benefits upon [him or her]." *Beals*, 1919-NMSC-067, ¶ 90. Where the advantaged spouse fails to make this showing, the district court is to "set aside the [agreements] . . . in question, to ascertain the value and extent of the community property, . . . and to divide the community property between the parties[.]" *Id.* ¶ 93.

## 2.      Whether Wife Gained a Decided Advantage Over Husband, Thereby Creating a Presumption of Constructive Fraud

{12}     Where one spouse receives grossly inadequate consideration for forfeiting his or her interest in community property, the other spouse is considered to have gained a decided advantage through constructive fraud,[4] rendering the transaction voidable. *See Primus*, 1944-NMSC-030, ¶¶ 12, 21, 22 (concluding that there existed a "legal presumption of constructive fraud" where the wife received only $1,000 from the community estate worth $50,000); *Beals*, 1919-NMSC-067, ¶¶ 72, 82 (concluding that the husband had "secured a decided advantage over the wife" where the wife received only $4,000 and her interest in the subject property was between $35,000 and $75,000). Our Supreme Court has also found constructive fraud where one spouse "had and took an advantage in the matters surrounding the conveyance of . . . property." *Trujillo v. Padilla*, 1968-NMSC-090, ¶ 6, 79 N.M. 245, 442 P.2d 203. The main question we are concerned with is whether the parties were "bargaining on an equal footing" in satisfaction of their fiduciary duties to one another. *Primus*, 1944-NMSC-030, ¶¶ 15, 21. Where the evidence indicates they were not, we may find constructive fraud.

{13}     Here, the record indicates that the net value of CSC was $257,461.26 as reflected by

---

[4]Constructive fraud is "a breach of a legal or equitable duty irrespective of the moral guilt of the fraud feasor, and it is not necessary that actual dishonesty of purpose nor intent to deceive exist." *Snell v. Cornehl*, 1970-NMSC-029, ¶ 8, 81 N.M. 248, 466 P.2d 94.

5

the proceeds placed in the registry of the court following the sale and payment of debts of CSC. Thus, Husband's one-half community interest was approximately $128,000. Under the SSPAs, Husband received $0 in exchange for conveying his interest to Wife. Even assuming Husband received the non-monetary "consideration" of being relieved of all financial and legal liability by signing the SSPAs—which argument we address below—Husband's considerable forfeiture supports a presumption of constructive fraud. Additionally, we note that prior to asking Husband to sign the SSPAs, Wife had consulted a divorce attorney as well as a business attorney, and it was Wife who drafted and provided Husband with the SSPAs. The record contains no indication that Husband—though he had a chance to review the SSPAs prior to signing them—had independent counsel regarding the agreements. Based on the foregoing facts, along with our statutory authority and legal precedent, we conclude that Wife gained a decided advantage over Husband through the SSPAs. We, therefore, next consider whether Wife met her burden to show (a) provision of adequate consideration, (b) full disclosure to Husband as to his rights and extent of the community property, and (c) that Husband had competent and independent legal advice prior to signing the SSPAs. *See Beals*, 1919-NMSC-067, ¶ 90.

**3.     Whether Wife Met Her Burden of Proving She Met Her Fiduciary Duties in Entering Into the SSPAs With Husband**

**a.     Consideration**

**{14}**     In a contract between spouses where one spouse gains a decided advantage over the other, the advantaged spouse bears the burden of proving that adequate consideration was provided to support the contract. *See id.* "Consideration consists of a promise to do something that a party is under no legal obligation to do or to forbear from doing something he has a legal right to do." *Heye v. Am. Golf Corp.*, 2003-NMCA-138, ¶ 12, 134 N.M. 558, 80 P.3d 495. A promise by one party to release from liability and indemnify or hold harmless the other party against damages sought by a third party may constitute adequate consideration to support a contract. *See Nakashima v. State Farm Mut. Auto. Ins. Co.*, 2007-NMCA-027, ¶ 13, 141 N.M. 239, 153 P.3d 664 ("Adequate consideration is present in a contract where something is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise." (internal quotation marks and citation omitted)). Likewise, promising to assume the debt of another may be valid consideration. *See id.*; *see also Thornton v. Wolf*, 2007-132, p. 2 (La. App. 3 Cir. 5/30/07); 958 So. 2d 131, 133 ("Assumption of a debt is valid consideration for the transfer of property."). To determine the parties' intent—including as to the consideration provided—we consider "the language employed by them; and where such language is not ambiguous, it is conclusive." *Greentree Solid Waste Auth. v. Cty. of Lincoln*, 2016-NMCA-005, ¶ 14, 365 P.3d 509 (internal quotation marks and citation omitted). Where the parties' language is unambiguous, we "cannot change [the] language for the benefit of one party to the detriment of another." *Nearburg v. Yates Petroleum Corp.*, 1997-NMCA-069, ¶ 23, 123 N.M. 526, 943 P.2d 560.

**{15}** Here, Wife contends that the consideration she provided to support the SSPAs was a promise that Husband would be released from all financial responsibility and legal liability for each of the properties identified in the SSPAs. The district court, apparently relying on Wife's testimony to that effect, agreed, finding that Husband "desired to be relieved of responsibility for existing debt and liability of both companies, and future debt and liability of the businesses and the propert[ies]" and concluding that "[a]s consideration for the [SSPAs, Husband] was relieved of all further financial responsibility and legal liability for the businesses." The problem with this conclusion, however, is that the SSPAs themselves contain no indication of this purported consideration.

**{16}** Each of the two SSPAs relating to real property (one for 251 Francis and one for the State Street property) provides, in full, the following:

> Pursuant to . . . [Section] 40-3-8(A)(5) . . . , [Wife] and [Husband] agree that the property located at:
>
> > [(address)]
>
> is hereby designated as the separate property of [Wife]. [Husband] hereby expressly grants and conveys the above described property to [Wife], with Special Warranty Covenants. [Husband] further expressly waives, relinquishes, and releases any and all right, title, claim, or interest in and to the above described property, heretofore or hereafter acquired.
>
> The parties further agree that all community income of the parties used to acquire or purchase the premises or make repairs or improvements thereon now or in the future, including community funds or income of the parties used to pay any indebtedness now or hereafter secured by lien against the premises is hereby designated as the separate property of [Wife].

The SSPAs for the LLCs provide:

> Pursuant to . . . [Section] 40-3-8(A)(5) . . . , [Wife] and [Husband] agree that the Membership Interest in [CSC/CSL], a New Mexico limited liability corporation, [is] hereby designated as the separate property of [Wife]. [Husband] expressly grants and conveys the above described Membership Interest to [Wife]. [Husband] further expressly waives, relinquishes, and releases any and all right, title, or interest in and to the above described Membership Interest, heretofore or hereafter acquired.

On their face, the SSPAs contain no language indicating what consideration Husband received in exchange for his relinquishment of all rights and interest in the properties and businesses. The district court concluded—and we agree—that the SSPAs "are not

7

ambiguous." Critically, they are unambiguously silent as to Wife's consideration to support the agreements, yet the district court took and apparently relied on parol evidence—Wife's testimony that Husband was released of "all liability"—in order to find consideration. This was error because parol evidence is properly admitted only in circumstances where a document or contract is facially ambiguous or to aid the court in determining whether a contract's terms are ambiguous. *See Ruggles v. Ruggles*, 1993-NMSC-043, ¶¶ 56-57, 116 N.M. 52, 860 P.2d 182 (explaining that because of ambiguity in the parties' marital settlement agreement, "extrinsic evidence of the parties' intent may be considered to aid in interpreting its terms"); *Mark V, Inc. v. Mellekas*, 1993-NMSC-001, ¶ 11, 114 N.M. 778, 845 P.2d 1232 (stating that courts "may also consider the context in which the agreement was made to determine whether the party's words are ambiguous"). However, "no [extrinsic] evidence should be received when its purpose or effect is to contradict or vary the agreement's terms." *Mark V*, 1993-NMSC-001, ¶ 13.

**{17}** The clear purpose of Wife's testimony was to vary the terms of the SSPAs by supplying consideration where none was expressly provided. When asked to explain "what it is you explained to [Husband] that [the SSPAs] would do[,]" Wife testified:

> Release him of all liability. At one point I basically read it. It's like a two sentence document. It says that [Husband] does not want to have any interest or involvement in whatever project or property and that he assigned that to me. And we discussed it, that he wouldn't have any liability. He wouldn't be responsible for the, you know, 1.5 million dollars I was going to borrow. And, again, if we got sued he wouldn't be . . . a property owner in that.

This testimony is revealing in that Wife's explanation of what she understood the SSPAs to say clearly goes beyond what the agreements, in fact, say. The SSPAs simply do not say that Husband "wouldn't have any liability" or that he "wouldn't be responsible for the . . . 1.5 million dollars [Wife] was going to borrow." And to the extent there is language in the SSPAs that could arguably be construed as indicating an intent to indemnify Husband as Wife described, ambiguities in a contract are to be construed most strongly against the drafter—here, Wife. *See Schultz & Lindsay Constr. Co. v. State*, 1972-NMSC-013, ¶ 6, 83 N.M. 534, 494 P.2d 612. By admitting this evidence and failing to give primacy to the unambiguous SSPAs in its construction of the agreements, the district court effectively read into the SSPAs a provision that is not there, which it was not at liberty to do. *See Archunde v. Int'l Surplus Lines Ins. Co.*, 1995-NMCA-110, ¶ 23, 120 N.M. 724, 905 P.2d 1128 ("We will not read into a contract provisions that the parties themselves have not seen fit to include."). Particularly in light of Wife's fiduciary duties in contracting with Husband and the heightened good faith obligation to prevent Wife from taking advantage of Husband by means of concealment or misrepresentation, we conclude that the SSPAs are unenforceable as contracts for lack of consideration. *See Figueroa v. THI of N.M. at Casa Arena Blanca, LLC*, 2013-NMCA-077, ¶ 17, 306 P.3d 480 ("Consideration is a prerequisite to the legal formation of a valid contract.").

### b. Full Disclosure and Independent Legal Counsel

**{18}** Even assuming arguendo that Wife's testimony was admissible and supplied sufficient evidence of consideration—meaning a valid contract was formed—the SSPAs are nevertheless voidable. That is because there is no evidence that (1) Wife disclosed to Husband the value of the properties and businesses to be conveyed or Husband's rights—and, importantly, potential liability[5]—therein; and (2) Husband had received competent and independent advice prior to signing the SSPAs. *See Beals*, 1919-NMSC-067, ¶ 90. The undisputed facts of this case are that Wife had a Master's degree in business, was an experienced business woman, and was in charge of managing and decision-making for the business. It is also undisputed that Husband had a high school education and was not involved in the management of the business, other than providing general maintenance work at the assisted living facility. Particularly in light of this power imbalance and Wife's dominant position respecting the business, it was imperative that Wife disclose to Husband the business's assets and his rights therein and that Husband have independent counsel in considering the ramifications of entering into the SSPAs. *See Fate v. Owens*, 2001-NMCA-040, ¶ 25, 130 N.M. 503, 27 P.3d 990 ("[A] fiduciary[] is required to fully disclose material facts and information relating to the [fiduciary relationship] . . . even if the [one to whom the duty is owed] ha[s] not asked for the information. . . . The duty of disclosure is a hallmark of a fiduciary relationship." (internal quotation marks and citations omitted)). *Cf. Unser v. Unser*, 1974-NMSC-063, ¶¶ 16-17, 86 N.M. 648, 526 P.2d 790 (explaining that in order for there to be presumptive fraud, one party must be "in the dominant position[,]" and finding no presumption of fraud because it was "questionable as to whether the relationship of dominance" existed where the wife had been "advised by independent legal counsel" prior to signing the agreement).

**{19}** Because the record indicates that Wife failed to meet her burden to overcome the presumption of constructive fraud, we hold that the SSPAs—even if validly formed—were voidable at Husband's election and must be set aside. *See Trujillo*, 1968-NMSC-090, ¶ 7; *Beals*, 1919-NMSC-067, ¶ 93. We reverse the district court's distribution of the properties

---

[5]Given that CSC and CSL were set up as single-member LLCs with Wife as the member and that the real property at issue (251 Francis and the State Street property) was the property of the LLCs, we fail to see—and the parties fail to explain—how Husband had any personal financial responsibility or legal liability for any of the subject properties to begin with. *See* NMSA 1978, § 53-19-13 (1993) (providing that "the debts, obligations and liabilities of a [LLC], whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the [LLC]"). To the extent he did not, this further supports our conclusion that the SSPAs lacked consideration. *See Hurley v. Hurley*, 1980-NMSC-067, ¶ 16, 94 N.M. 641, 615 P.2d 256 (explaining that "a promise to do what a party is already obligated by contract or law to do is not sufficient consideration for a promise made in return"), *overruled on other grounds by Ellsworth v. Ellsworth*, 1981-NMSC-132, ¶ 6, 97 N.M. 133, 637 P.2d 564.

covered by the SSPAs and remand for further proceedings in light of this opinion.

## II. Whether the District Court Erred in Distributing the Equity in the Francis Home

{20} Husband argues that the district court erred in its distribution of the Francis Home by failing to award him his $30,000 separate property interest in the home, which was the down payment he made when he purchased the home prior to meeting Wife. Wife argues that there was substantial evidence to support the district court's findings and conclusions regarding distribution of the Francis Home, which were premised upon the conclusion that whatever separate interest Husband possessed in the Francis Home was transmuted to a community interest. We agree with Husband that the district court erred.

### A. Standard of Review

{21} To the extent Husband argues that there is an insufficient factual basis to support the district court's findings of fact regarding the Francis Home, "we review the evidence in the light most favorable to support the [district] court's findings, resolving all conflicts and indulging all permissible inferences in favor of the decision below." *Jones v. Schoellkopf*, 2005-NMCA-124, ¶ 8, 138 N.M. 477, 122 P.3d 844. However, to the extent Husband attacks the district court's conclusions of law respecting the Francis Home—including those findings that function as conclusions—our review is de novo. *See id.*; *see also Benavidez v. Benavidez*, 2006-NMCA-138, ¶ 21, 140 N.M. 637, 145 P.3d 117 ("We are deferential to facts found by the district court, but we review conclusions of law de novo."). We also review de novo questions of law, including threshold determinations regarding whether property is separate or community or whether the community has acquired an interest in separate property. *See Arnold v. Arnold*, 2003-NMCA-114, ¶ 6, 134 N.M. 381, 77 P.3d 285 (explaining that "the threshold question of whether [the h]usband's accumulated vacation leave and sick leave are community property is a question of law, which we review de novo"); *Ross v. Negron-Ross*, 2017-NMCA-061, ¶ 7, 400 P.3d 305 (explaining that "[w]hether the district court erred in finding no community lien on the Spring Creek residence [(separate property)] is a question of law that we review de novo").

### B. The District Court Erred in Concluding That the Francis Home Was Transmuted From Husband's Separate Property to Community Property

{22} The district court entered the following findings of fact regarding the Francis Home:

> 5.    Prior to the marriage, in 2004, [Husband] had purchased [the Francis Home]. The purchase price was $147,000 and [Husband] had made an approximate $30,000 down-payment.
>
> . . . .

10

14.    Soon after the marriage, [Husband] transferred the [Francis Home] to himself and [Wife]. The parties refinanced the debt on the house to get a more favorable interest rate. [Husband] testified that the reason he did so was because he believed marriage was "sacred." This act transmuted the [Francis Home] into community property.

15.    During the marriage, the parties made the mortgage payments and made approximately $40,000 worth of improvements to the house. At the time of trial the value of the [Francis Home] was $150,000. No appraisal was offered. ([Husband] estimated the value at $140,000 and [Wife] estimated the value at $160,000.) There is $94,000 owing on the mortgage. The equity in the property is approximately $56,000.

From these findings, the district court concluded, "The Francis [Home] is community property. The parties are entitled to one-half each of the $56,000 equity in the house."

**{23}**    The first flaw in the district court's conclusion is that Wife never contended that Husband's separate interest in the Francis Home had been transmuted into community property. Wife's claims and contentions—as well as her opening and closing arguments to the district court—reveal that Wife believed she was entitled to either (1) reimbursement of one-half of the $40,000 of improvements the community made to the Francis Home, or (2) one-half of the remaining "community equity" in the home after Husband was repaid his down payment.[6] In other words, the position Wife took and her proposed distribution of property evince her belief that the Francis Home was Husband's separate property.[7] *See*

---

[6]We note that two days after submitting her written closing argument, Wife filed a document titled "Supplement to Closing Argument" in which she cited in her "list of authorities" this Court's decision in *Macias v. Macias*, 1998-NMCA-170, 126 N.M. 303, 968 P.2d 814, and provided the following parenthetical explanations: "(Separate property, the [Francis Home], placed in joint ownership along with intent to transmute results in transmutation) and (Court should consider factors 1) deed to community, 2) mortgage by community, 3) intent of grantor, 4) community payment of mortgage, taxes, maintenance and upgrades) and (property acquired during marriage presumed to be community and burden rests with protesting spouse to prove otherwise)." However, Wife cited no other authority and offered no additional argument or analysis to support a finding of transmutation. Wife's appellate arguments—which make no reference to transmutation or cite any relevant authority to defend the district court's conclusion that a transmutation occurred—further support our understanding that it was never Wife's position that the Francis Home was transmuted. *See State ex rel. Human Servs. Dep't v. Staples* (*In re Doe*), 1982-NMSC-099, ¶¶ 3, 5, 98 N.M. 540, 650 P.2d 824 (explaining that appellate courts should not reach issues that the parties have failed to raise in their briefs).

[7]Even though Wife asserted in her proposed findings that Husband deeded the Francis Home to himself and Wife "with the intent to make the property community

*Trego v. Scott*, 1998-NMCA-080, ¶ 5, 125 N.M. 323, 961 P.2d 168 (explaining that the wife had "conceded, by her chosen method of calculating the monies due her, that the properties in dispute remained separate" because the wife's "own computations" revealed that she assumed the community's interest was an apportioned interest in the increased value of the separate property). As we discuss below, Wife only contended that there was a community lien on the Francis Home, which would entitle Wife to a different, lesser interest in the Francis Home than would the conclusion that a transmutation occurred.

**{24}**    The second and more problematic flaw in the district court's conclusion that a transmutation had occurred is that it is contrary to New Mexico case law, which establishes a high legal standard for proving transmutation. "Transmutation is a general term used to describe arrangements between spouses to convert property from separate property to community property and vice versa." *Allen v. Allen*, 1982-NMSC-118, ¶ 13, 98 N.M. 652, 651 P.2d 1296. While New Mexico recognizes transmutation, this Court has explained that "[t]he spouse who argues in favor of transmutation carries what has been variously described as a 'difficult' or a 'heavy' burden[.]" *Macias*, 1998-NMCA-170, ¶ 12. Transmutation must be proven by "clear and convincing evidence of spousal intent to do so." *Id.* A deed, other document showing joint title, or mortgage note alone is not conclusive of intent to transmute. *See id.* ¶ 13 (explaining that "a deed or other document showing joint title does not transmute separate property if there is no intent to do so" and that "a mortgage may be evidence of such intent to transmute, but it is not conclusive and is not, by itself, substantial evidence of intent to transmute" (omission, emphasis, internal quotation marks, and citation omitted)). Proving "transmutation requires evidence of intent on the part of the grantor spouse." *Id.*

**{25}**    Here, the district court's findings make clear that it relied on three things to support its conclusion that transmutation occurred: (1) that soon after marriage, Husband "transferred the [Francis Home] to himself and [Wife;]" (2) that Husband and Wife "refinanced the debt on the house to get a more favorable interest rate[;]" and (3) Husband's statement that he "thought being married was kind of a sacred thing" when asked by his attorney what his intention was when he added Wife's name to the deed. Nowhere did the district court find that Husband intended to make a gift to Wife or create in her an undivided one-half interest in the Francis Home. And indeed, under New Mexico transmutation law and given (1) the absence of evidence in the record indicating that Husband had the requisite intent to effect transmutation, (2) the fact that Wife conceded that the Francis Home was Husband's separate

---

property[,]"within that same proposed finding Wife suggests the inherently contradictory conclusion that "[i]f [Husband] gets credit for his $32,000 down payment there is still $34,000 in community equity." In other words, Wife's assertion as to Husband's intent cannot be reconciled with the way in which she calculated her claimed interest in the Francis Home, i.e., as a community lien rather than an undivided one-half interest. If Wife was truly claiming that Husband intended to transmute the Francis Home from his separate property to community property, Wife would have claimed one-half interest in the full equity of the home rather than the full equity minus Husband's down payment (separate property).

12

property, and (3) that Wife employed a litigation strategy designed to protect only her interest in the community lien on the property, it could not have. We hold that the district court's conclusion that the Francis Home was transmuted from Husband's separate property into community property is incorrect as a matter of law. Thus, we reverse the district court's award to Wife of an automatic one-half interest in the Francis Home's equity. The question that remains, then, is to what portion—if any—of the equity in the Francis Home is Wife entitled?

**C.      Acquisition of a Community Interest in Separate Property and Apportionment Thereof**

**{26}**     As previously noted, Wife's position during trial was that the marital community had acquired an interest in the Francis Home of which Wife was entitled to one-half. Wife's primary argument in this regard was that the community had contributed $40,000 to various home improvements—including the addition of "hardwood floors, a large nice deck, some new doors, new window treatments, kitchen, bathroom, sinks, countertops, kitchen appliances, furniture"—that Wife believed increased the value of the home. Wife initially contended she should "recover [one-half] of the remodel cost to" the Francis Home, or $20,000. In her closing argument, Wife added a claim for one-half "the community equity" in the home, which she calculated to be $17,000. Wife arrived at the figure of $17,000 by first assuming the district court would find that there was $66,000 in total equity in the home,[8] then subtracting what Wife described as Husband's "down payment as sole and separate property ($32,000)," which would leave $34,000 in "community equity" to which Wife would be entitled to one-half, or $17,000. Wife continued to seek one-half of the $40,000 remodel cost in addition to the $17,000 of community equity. As stated, the district court awarded Wife one-half ($28,000) of the total equity it determined to exist in the Francis Home ($56,000) based on its conclusion that a transmutation occurred.

**{27}**     Where, as here, a party claims that appreciation during marriage of separate property is owing to community contributions, apportionment is the proper method of determining the respective interests—i.e., separate and community—in the asset upon dissolution. *See Dorbin v. Dorbin*, 1986-NMCA-114, ¶ 15, 105 N.M. 263, 731 P.2d 959. "[A]pportionment is a legal concept that is properly applied to an asset acquired by married people with mixed monies—that is, partly with community and partly with separate funds." *Id.* ¶ 29 (internal quotation marks omitted). An "asset acquired" may include the increased equity in one spouse's separate real property. *See id.* ¶¶ 11, 24, 27 (apportioning the "appreciation equity" in the wife's separately owned townhouse between the wife's separate interest and the community's interest); *see also Michelson v. Michelson*, 1976-NMSC-026, ¶¶ 20-22, 89 N.M. 282, 551 P.2d 638 (affirming the district court's apportionment of the equity in the

---

[8]This figure is based on an assumption that the Francis Home was valued at $160,000 at the time of trial per Wife's testimony and that there remained a balance of $94,000 on the mortgage.

parties' home—which was originally acquired with the husband's separate property—between "community expenditures of time, effort and money" (the community's interest) and "the normal appreciation of property" (the husband's separate interest)).

**{28}** To determine whether apportionment is appropriate, the district court must first decide whether the community has, in fact, acquired an interest in the separate property. *See Martinez v. Block*, 1993-NMCA-093, ¶ 13, 115 N.M. 762, 858 P.2d 429 ("Apportionment is appropriate only when an asset has been acquired or its equity value increased through the use of both separate and community funds."). If there is no evidence of a community interest in the equity of separate property, the separate interest is entitled to the full value of the property and apportionment is not proper. *See Hertz v. Hertz*, 1983-NMSC-004, ¶¶ 22-23, 99 N.M. 320, 657 P.2d 1169 (holding that the husband was entitled to the full value of appreciation of his separate property rather than only "proportionate appreciation" where there was no evidence to support apportionment of the appreciation).

**{29}** In general, when property is "acquired as separate property, it retains such character even though community funds may later be employed in making improvements or discharging an indebtedness thereon." *Campbell v. Campbell*, 1957-NMSC-001, ¶ 80, 62 N.M. 330, 310 P.2d 266. However, the community may acquire an interest in—specifically a lien on—separate property where the community's contributions have enhanced the value of the separate property. *See Ross*, 2017-NMCA-061, ¶ 8 ("The community is . . . entitled to a lien against the separate property of a spouse for the contributions made by the community that enhanced the value of the property during marriage."). Contributions by the community do not, alone, give rise to a community interest. *See Martinez*, 1993-NMCA-093, ¶ 12 (explaining that "the simple fact that the community has expended funds or labor on a separate asset does not, by itself, give rise to either a community interest in the asset or a right to reimbursement for money spent on the asset"). Rather, it is only the increase—if any—in the value of the asset attributable to community contributions that is apportioned among separate and community interests. *See Jurado v. Jurado*, 1995-NMCA-014, ¶ 10, 119 N.M. 522, 892 P.2d 969; *Martinez*, 1993-NMCA-093, ¶ 11 ("[U]nder New Mexico law the community is entitled to an equitable lien against [a spouse's] separate property only to the extent that the community can show that its funds or labor enhanced the value of the property or increased the equity interest in the property."). "Any increase in the value of separate property is presumed to be separate unless it is rebutted by direct and positive evidence that the increase was due to community funds or labor." *Jurado*, 1995-NMCA-014, ¶ 11. The party claiming the existence of a community lien on separate property bears the burden of proving that the property's appreciation is attributable to the expenditure of community, rather than separate, funds. *See Trego*, 1998-NMCA-080, ¶ 8.

**{30}** Here, in order to be entitled to a community lien on the Francis Home, it was Wife's burden to prove that some portion (up to the full amount) of the home's appreciation equity at the time of dissolution was attributable to the home improvements made with community funds and/or the community's contributions to paying down the principal balance on the

14

mortgage. *See Dorbin*, 1986-NMCA-114, ¶ 21; *cf. Mitchell v. Mitchell*, 1986-NMCA-028, ¶¶ 48-49, 104 N.M. 205, 719 P.2d 432 (affirming the district court's calculation of the community's lien and its refusal "to credit the community with any appreciation in the value of [the husband's separate] property" where there was "no evidence as to the value of [the claimed] improvements"). However, the district court's findings—which addressed the non-issue of transmutation rather than the disputed issue of whether the community had acquired an interest in (to wit, a community lien on) the Francis Home—are insufficient to allow us to decide whether Wife met her burden. *See Green v. Gen. Accident Ins. Co. of Am.*, 1987-NMSC-111, ¶ 21, 106 N.M. 523, 746 P.2d 152 ("When findings wholly fail to resolve in any meaningful way the basic issues of fact in dispute, they become clearly insufficient to permit the reviewing court to decide the case at all." (alterations, internal quotation marks, and citation omitted)). As such, we remand to the district court for the entry of findings of fact on the question of the existence of a community lien on the Francis Home. *See Green*, 1987-NMSC-111, ¶ 22 ("Where the ends of justice require, [an appellate court] may remand a case to district court for the making of proper findings of fact."). If the district court determines that the community acquired an interest in the Francis Home, it must then proceed to apportion the equity in the Francis Home between Husband's separate interest and the community's interest in accordance with New Mexico case law.[9] *See Ross*, 2017-NMCA-061, ¶ 12.

**{31}** We emphasize that we do not pass on (1) whether the community acquired an interest in Husband's separate property, or (2) the proper apportionment of such interest, assuming the evidence supports a finding that one exists. Those determinations must be made in the first instance on remand. We hold only that the district court erred in concluding that the Francis Home was transmuted from Husband's separate property to community property and

[9]See, e.g., *Trego*, 1998-NMCA-080, ¶ 13 ("No one method of apportionment is favored above all others; the trial court may use whatever method will achieve substantial justice, and is supported by substantial evidence in the record."); *Dorbin*, 1986-NMCA-114, ¶¶ 23-24, 31-33 (discussing two formulas for apportioning property, one that the *Dorbin* Court adopted and applied (the *Moore* formula) and one that our Supreme Court had applied in earlier cases ("fair return" formula)); *see also Chance v. Kitchell*, 1983-NMSC-012, ¶ 6, 99 N.M. 443, 659 P.2d 895 (explaining that a party claiming a community interest in separate property is entitled only to "the value of the improvements to the property, *not* the cost of the improvements" and that "when determining a community interest in community funds expended on behalf of property purchased by a spouse before marriage, the rule has commonly excluded payments for taxes, insurance and interest"); *Michelson*, 1976-NMSC-026, ¶¶ 20-22 (affirming the trial court's calculation of the value of the community lien on the parties' home (the husband's separate property) where the trial court first deducted from the home's value at the time of trial $14,000 of the husband's separate property used to purchase the lot on which the home was built); *Dorbin*, 1986-NMCA-114, ¶ 21 (explaining that the community is "entitled to a lien for mortgage payments made with community money, but only to the extent that the mortgage principal was reduced").

15

in distributing the equity in the Francis Home in accordance with that conclusion.

### III.     Whether the District Court Properly Addressed and Distributed Other Property

**The 1955 Chevrolet**

**{32}**     Husband argues that the district court failed to make a determination about and properly distribute Husband's interests in a 1955 Chevrolet. At trial, Husband testified that Wife had given him the car for his birthday in either 2009 or 2010 and that because Husband was busy, Wife registered the car in her name. Wife objected to Husband's testimony based on Husband's failure to include the property in his claims and contentions, but the district court overruled the objection and allowed the testimony. Husband then testified that the vehicle was worth anywhere from $14,000 to $20,000 and that he had invested $5,000 of separate property to install a new engine in the car. The only other testimony regarding the 1955 Chevrolet was made during Husband's explanation of his basis for believing that Wife was laying groundwork "to finally get rid of [him,]" a plan that he stated included, "Everything that happened throughout the marriage now that I opened my eyes. The [SSPAs], the giving her daughter the house, *the '55 Chevy leaving*, the Duramax leaving, the mule leaving." (Emphasis added.) Husband offered no other testimony regarding the 1955 Chevrolet nor did he cross-examine Wife about the car.

**{33}**     Husband's proposed findings included the following related to the 1955 Chevrolet:

24.     [Wife] gave [Husband] the 1955 Chevrolet as a gift.

25.     The engine installed into the 1955 Chevrolet was the separate property of [Husband].

26.     The value of the 1955 Chevrolet was $20,000.

27.     [Wife] appropriated the 1955 Chevrolet and re-gifted it to her children or sold it.

28.     [Husband] did not relinquish or consent to the removal of the 1955 Chevrolet.

29.     [Husband] did not receive compensation for the loss of the 1955 Chevrolet.

Husband's requested conclusions of law included that he is entitled to compensation for the value of the 1955 Chevrolet and reimbursement for the value of his separate property in the car. Wife's proposed findings and conclusions did not contain any mention of the 1955 Chevrolet. The district court did not include any findings or conclusions regarding the 1955

16

Chevrolet in its order, which Husband argues constituted error and requires remand.

**{34}** We first observe that the district court was under no obligation to take evidence regarding property that Husband conceded at trial was not listed in his claims and contentions. *See Rutter v. Rutter*, 1964-NMSC-242, ¶ 17, 74 N.M. 737, 398 P.2d 259 (holding that the district court properly rejected evidence related to an issue "outside of the issues raised by the pleadings"). Once the district court allowed Husband to testify regarding the 1955 Chevy, however, the question is whether it erred by not entering findings or a conclusion about the vehicle. It is well-established that a district court's failure to make a specific requested finding of fact constitutes a finding against the requesting party. *See Olivas v. Olivas*, 1989-NMCA-064, ¶ 15, 108 N.M. 814, 780 P.2d 640. Particularly where the requesting party has the burden of proof as Husband did here, *cf. Wallace v. Wanek*, 1970-NMCA-049, ¶ 9, 81 N.M. 478, 468 P.2d 879 (explaining that "[h]e who alleges the affirmative must prove"), "the district court properly could have decided that [the] husband did not meet his burden . . . and therefore could reject [the] husband's proposed findings of facts and conclusions of law on this matter." *Olivas*, 1989-NMCA-064, ¶ 15. Here, the district court—presented with little more than Husband's stand-alone testimony about "the '55 Chevy leaving" and his assertion regarding its engine—could have decided that Husband was not credible and failed to meet his burden of proving that there were property interests in the 1955 Chevy that required distribution. "It is the sole responsibility of the trier of fact to weigh the testimony, determine the credibility of the witnesses, reconcile inconsistencies, and determine where the truth lies, and we, as the reviewing court, do not weigh the credibility of live witnesses." *N.M. Taxation & Revenue Dep't v. Casias Trucking*, 2014-NMCA-099, ¶ 23, 336 P.3d 436 (alteration, internal quotation marks, and citation omitted).

**{35}** Not only do we conclude that the district court did not err in refusing to adopt Husband's proposed findings and conclusions regarding the 1955 Chevrolet, it would have been error to adopt Husband's proposed findings number twenty-seven, twenty-eight, and twenty-nine given that there was no evidence to support them. There was no testimony that Wife appropriated or re-gifted the car, that Husband did not consent to removal of the car, or that he had never received compensation for it. As such, the district court's effective conclusion that Husband failed to meet his burden of claiming and proving that he had separate and community property interests in the 1955 Chevrolet supported its rejection of Husband's proposed findings. *See Russell v. Russell*, 1990-NMCA-080, ¶ 17, 111 N.M. 23, 801 P.2d 93 ("A trial court is only required to make findings of such ultimate facts as are necessary to determine the issues."). We hold that the district court did not err by entering no findings or conclusions regarding the 1955 Chevrolet in its order.

**The Texas Property**

**{36}** Husband makes a markedly similar argument with respect to the Texas property which he and Wife co-signed for and acquired during the marriage. Husband acknowledges that the district court made the following finding regarding the Texas property:

24.    The parties co-signed a purchase for [Wife]'s daughter . . . . They were named on the deed and mortgage. The money for the purchase came from [Wife's daughter]. When they were no longer co-signers, the parties quitclaimed the property to [Wife's daughter]. The parties had no real interest in the property.

But Husband contends that the district court "fail[ed] to determine the community interest in the Texas [p]roperty," which we understand to be a challenge to the sufficiency of the evidence to support the district court's finding. We review for substantial evidence to determine whether there is "such relevant evidence that a reasonable mind would find adequate to support a conclusion." *State ex rel. King v. B & B Inv. Grp., Inc.*, 2014-NMSC-024, ¶ 12, 329 P.3d 658 (internal quotation marks and citation omitted). "[W]e review the evidence in the light most favorable to support the trial court's findings, resolving all conflicts and indulging all permissible inferences in favor of the decision below." *Jones*, 2005-NMCA-124, ¶ 8.

**{37}**    Wife testified that she and Husband co-signed a note in order for her daughter to purchase the Texas property and that Wife's daughter paid the down payment. Wife and Husband eventually deeded the house to Wife's daughter after Wife's daughter had been working for a while and "felt like she . . . could handle it [by] herself[.]" Husband testified that he did not know the source of the funds used for the down payment for the Texas property. This, alone, is substantial evidence to support the district court's finding that the parties had no real interest in the Texas property, thus making it unnecessary for the district court to distribute anything related thereto.

**Wife's Income**

**{38}**    Husband argues that the district court erred by failing to address and distribute Wife's $283,000 of earnings during the marriage. In support of this argument, Husband cites to this Court's decision in *Irwin v. Irwin* in which we explained that "under New Mexico community property law[,] each spouse has a one-half ownership interest in all community income or community assets acquired during the marriage." 1996-NMCA-007, ¶ 13, 121 N.M. 266, 910 P.2d 342. But *Irwin* does not stand for the proposition that any money earned during the marriage was community property that needed to be divided between the parties at the time of divorce as Husband contends. *Irwin*, in fact, applied the limiting principle to the general rule regarding income earned during marriage that "once community . . . earnings are expended, rather than being converted into an asset, there is no community asset to be shared or managed, and the spouse making the expenditure has no duty to reimburse the community absent some special circumstance." *Id.* This Court rejected the wife's argument in *Irwin* that she was entitled to an automatic one-half interest in the husband's income earned during their separation period when the husband had already expended all of the funds. *Id.* ¶ 14.

18

**{39}** Here, Husband presented no evidence regarding the status of Wife's $283,000 in earnings, i.e., what portion, if any, had not been expended or converted to assets and would thus be available for distribution. His theory—that Wife "converted community assets to her own use and the community is entitled to reimbursement for the value of those assets"—was not supported by substantial evidence, or any evidence for that matter. We thus hold that the district court properly rejected Husband's request and did not err by not distributing Wife's income earned during the marriage.

**CONCLUSION**

**{40}** We reverse the district court's judgment with respect to the SSPAs and the Francis Home and remand for further proceedings consistent with this opinion. We affirm the district court's distribution of all other property.

**{41}** **IT IS SO ORDERED.**

_____
**J. MILES HANISEE, Judge**

**WE CONCUR:**

_____
**LINDA M. VANZI, Chief Judge**

_____
**TIMOTHY L. GARCIA, Judge**