This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**JASON GOLD,**

Worker-Appellant,

v.                                                    **No. A-1-CA-36052**

**ARMAND HAMMER UNITED WORLD COLLEGE, and NM SW CASUALTY CO. C/O AIG,**

Employer/Insurer-Appellee.

**APPEAL FROM THE WORKERS' COMPENSATION ADMINISTRATION**
**David L. Skinner, Workers' Compensation Judge**

Dorato & Weems LLC
Derek Weems
Albuquerque, NM

for Appellant

Hoffman Kelley Lopez L.L.P.
David Wertz
Albuquerque, NM

for Appellees

Workers' Compensation Administration
WCA Assistant General Counsel
Craig C. Kling, Special Assistant Attorney General

Albuquerque, NM

for Amicus Curiae

**MEMORANDUM OPINION**

**BOHNHOFF, Judge.**

{1}     Jason Gold (Worker) appeals from the Workers' Compensation Judge's (WCJ) September 22, 2016 compensation order and November 2, 2016 amended compensation order, as modified by the WCJ's October 24, 2016 order on motion for reconsideration, and November 22, 2016 memorandum opinion. Worker raises three issues on appeal: (1) the WCJ erred in not awarding Worker seven hundred weeks of permanent partial disability (PPD) benefits based on his secondary mental impairment; (2) the WCJ erred in failing to adopt the parties' pretrial stipulations and entered a judgment that went beyond the parties' requested relief; and (3) the WCJ erred in relying upon the American Medical Association's Guides to the Evaluation of Permanent Impairment, Sixth Edition (AMA Guides Sixth Edition) in establishing Worker's impairment rating. We affirm.

**BACKGROUND**

{2}     This is a memorandum opinion; because the parties are familiar with the facts and procedural posture of the case, we set forth only such facts and law as are necessary to decide the issues raised.

**{3}** Worker worked as a maintenance employee at Armand Hammer United World College (Employer). On May 3, 2012, Worker suffered an on-the-job, compensable accident when he stepped or fell out of a pickup and injured his right great toe. To address the injury, Dr. Rockwood performed two surgical procedures on Worker: "excision of tibial sesamoid repair of metatarsal phalangeal joint capsule, common excision of fragment and arthrotomy of interphalangeal joint" and "resection of neuroma and burying of nerve of right foot." The surgeries worsened Worker's condition. He developed Chronic Regional Pain Syndrome, Type 1 (CRPS), which in turn resulted in "gait disturbance with inverted foot deformity and number two through four digits extended and not purchasing ground." Further, as a result of this physical condition Worker developed a secondary mental illness in the form of panic attacks, chronic pain, depression and anxiety.

**{4}** Worker was not able to return to his job duties and Employer terminated his employment because it could not accommodate his physical restrictions. On June 26, 2014, Worker filed a complaint seeking benefits under the Workers' Compensation Act, NMSA 1978, Sections 52-1-1 to -52-1-70 (1929, as amended through 2017) (the Act), and his case was tried by the WCJ on August 30, 2016. The WCJ ruled as follows: (1) Worker reached maximum medical improvement (MMI) for his CRPS as of March 25, 2014, and for his secondary mental illness as of September 29, 2015; (2)

3

Worker was entitled to temporary total disability benefits from May 2, 2012, to September 29, 2015; (3) Based on the parties' stipulations and the report of the panelists who conducted an independent medical examination (IME), the WCJ declined to find that Worker suffered any further injuries, in particular, "additional injury to the entire right lower extremity, the low back, left knee injury and PTSD"; (4) With respect to Worker's physical condition, the WCJ approved as reasonable and necessary continued management of his CRPS by Dr. Schwartz and her referrals; The WCJ rejected Dr. Rockwood's recommendation of further surgical intervention "in light of the past results of surgical procedures performed by Dr. Rockwood"; (5) The WCJ stated more broadly that, "Continued medical care with Dr. Rockwood is not reasonable and necessary for treatment of Worker's CRPS condition." In his Memorandum Opinion, the WCJ elaborated: "[I]t is WCJ Skinner's opinion that treatment of Worker's CRPS should be under the direction of one HCP with experience and expertise related to CRPS. Simply put, it is WCJ Skinner's opinion that Dr. Rockwood lacks such experience and expertise. Treatment of Worker's CRPS condition should be under the direction of a pain management specialist such as Dr. Schwartz"; (6) With respect to Worker's mental condition, the WCJ approved as reasonable and necessary therapy sessions with Dr. Donovan and medication management with Dr. Guillen; (7) Pursuant to the AMA Guides Sixth Edition, Worker

4

has a 7% lower extremity impairment as a result of the CRPS; based on the AMA Guides Sixth Edition, the WCJ found no whole person impairment resulting from Worker's physical condition; on the basis of this impairment rating, the WCJ concluded that as of September 29, 2015, Worker was entitled to 50% loss of use benefits for 35 weeks pursuant to Section 52-1-43(A)(33); and (8) As of September 29, 2015, Worker suffered from a 20% mental impairment due to a combination of work-related and pre-existing non-work-related mental illness. On this basis, and in accordance with Section 52-1-26, for his secondary mental impairment Worker was entitled to 84% permanent partial disability benefits for 100 weeks pursuant to Section 52-1-42(A)(4) (1990).

**DISCUSSION**

**A.     The WCJ Did Not Err in Awarding Worker Only 100 Weeks of Permanent Partial Disability Benefits for His Secondary Mental Impairment**

{5}     Worker argues that, because the WCJ determined that he was entitled to 84% PPD benefits for his mental impairment, pursuant to Section 52-1-42(A)(1), he should have been awarded those benefits for 700 weeks. He further argues that the WCJ erred in limiting those benefits to 100 weeks on the basis of Section 52-1-42(A)(4) (1990), given that *Breen v. Carlsbad Mun. Schs.*, 2005-NMSC-028, 138 N.M. 331, 120 P.3d 413, held that statute unconstitutional because it discriminated against persons with disabilities stemming from mental as opposed to physical impairments. "We review

5

the WCJ's application of the law to the facts . . . de novo." *Tom Growney Equip. Co. v. Jouett*, 2005-NMSC-015, ¶ 13, 137 N.M. 497, 113 P.3d 320.

{6}      Sections 52-1-42 and 52-1-43 specify the duration of the benefit payment that a worker who has sustained a compensable injury and resulting PPD[1] is entitled to receive. If a worker has been disabled as a result of an injury to any of the body members listed in Section 52-1-43, he or she will receive the number of weeks (between 7 and 200) of benefits set forth in that statute that correspond to the specific injured body member. Section 52-1-42 addresses the duration of benefits a worker with a permanent partial disability will receive if the benefits are not covered by Section 52-1-43. Section 52-1-42(A)(1) provides that, if the percentage partial disability, as determined pursuant to the provisions of Sections 52-1-26 to -26.4, is equal to or greater than 80%, the worker will receive benefits for up to 700 weeks; Section 52-1-42(A)(2) provides that, if the percentage partial disability is less than 80%, the worker will receive benefits for up to 500 weeks.

{7}      Section 52-1-42(A)(3), (4), however, specifically address the duration of the benefits that a worker who is disabled as a result of a mental impairment will receive. These provisions were amended by our Legislature in 2015. *See* 2015 N.M. Laws, ch. 70, § 2. Prior to that date, they provided as follows:

---

[1]Section 52-1-41(B) addresses the duration of benefits a worker with a total permanent disability will receive.

> (3)    where the partial disability results from a primary mental impairment, the maximum period [of benefits] is one hundred weeks; and
>
> (4)    where the partial disability results from a secondary mental impairment, *the maximum period is the maximum period allowable for the disability produced by the physical impairment or one hundred weeks, whichever is greater.*

Section 52-1-42(A)(3), (4) (1990) (emphasis added). A "primary mental impairment" is "a mental illness arising from an accidental injury arising out of and in the course of employment when the accidental injury involves no physical injury and consists of a psychologically traumatic event that is generally outside of a worker's usual experience and would evoke significant symptoms of distress in a worker in similar circumstances[.]" Section 52-1-24(B) (1990). A "secondary mental impairment" is "a mental illness resulting from a physical impairment caused by an accidental injury arising out of and in the course of employment." Section 52-1-24(C). Thus, a "secondary mental impairment occurs where physical injury did cause the mental impairment. . . . [while] a primary mental impairment . . . occurs as a result of the traumatic event regardless of the presence of any physical injury." *Chavez v. Mountain States Constructors*, 1996-NMSC-070, ¶ 44, 122 N.M. 579, 929 P.2d 971 (emphasis omitted).

**{8}**    In *Breen*, two workers suffered temporary *total* primary mental impairments. 2005-NMSC-028, ¶ 1. They had been disabled for over 240 weeks. However, because

7

of the cap on benefits for total disability stemming from a primary mental impairment set forth in Section 52-1-41(B) (1999), the workers were awarded only 100 weeks of benefits.[2] *Breen*, 2005-NMSC-028, ¶ 4. The workers claimed that the Act violated their equal protection rights under the United States and New Mexico constitutions, "because it caps all forms of compensation for persons with primary mental impairments at 100 weeks, while allowing substantially more compensation for persons with physical impairments." *Breen*, 2005-NMSC-028, ¶ 7.

{9}     Our Supreme Court agreed. Section 52-1-41 (1999) and Section 52-1-42 (1990) "create categories of similarly situated individuals, either totally impaired or partially impaired." *Breen*, 2005-NMSC-028, ¶ 10.

> Within those similarly situated groups, persons with mental disabilities are treated differently than those with physical disabilities. Workers who suffer total disability because of a physical injury can receive compensation for the rest of their lives, [Section] 52-1-41(A), while workers who suffer total disability because of a primary mental impairment can only receive up to 100 weeks of compensation[.]

---

[2]Section 52-1-41(A) (1999) provided that, "[e]xcept as provided in Subsections B and C of this section," a totally disabled worker would "receive compensation benefits for the remainder of his life." Similar to the cap on partial disability benefits based on a primary mental impairment set forth in Section 52-1-42(A)(3) (1990), Section 52-1-41(B) (1999) provided that, "For [total] disability resulting from primary mental impairment, the maximum period of compensation is one hundred weeks." And similar to the cap on partial disability benefits set forth in Section 52-1-42(A)(4) (1990), Section 52-1-41(B) (1999) further provided that, "For [total] disability resulting in secondary mental impairment, the maximum period of compensation is the maximum period allowable for the disability produced by the physical impairment or one hundred weeks, whichever is greater."

8

*Breen*, 2005-NMSC-028, ¶ 10. The Court held that Section 52-1-41 and Section 52-1-42 "violate equal protection by discriminating against the mentally disabled" and ordered that "the duration of compensation for primary mental and physical impairments under Sections 52-1-41 and -42 be treated equally for purposes of benefit compensation." *Breen*, 2005-NMSC-028, ¶ 50.

{10} In 2015, our Legislature amended Section 52-1-42(A)(3), (4) by removing the 100-week benefit limits. Section 52-1-42(A)(3), (4) now read as follows:[3]

> (3)    where the partial disability results from a primary mental impairment, the maximum period is the maximum period allowable for a physical injury, as set forth in Section 52-1-26 NMSA 1978, and subject to the maximum duration and limitations on compensation benefits set forth in Section 52-1-47 NMSA 1978; and

> (4)    where the partial disability results from a secondary mental impairment, the maximum period is the maximum period allowable for the disability produced by the physical impairment, as set forth in Section 52-1-26 or 52-1-43 NMSA 1978, and subject to the maximum duration and limitations on compensation benefits set forth in Section 52-1-47 NMSA 1978.

{11} In the case at bar, the WCJ did not apply the 2015 amended version of Section 52-1-42(A)(4), instead applying the 1990 version that was in effect in 2012 when Worker suffered his injury. *See Jojola v. Aetna Life & Cas.*, 1989-NMCA-085, ¶ 7,

---

[3]A parallel change was made to Section 52-1-41(B) (1999) (now designated 52-1-41(C)) to make total disability benefits for primary mental impairment payable for the "period allowable for a physical injury" and such benefits for secondary mental impairment payable for the "period allowable for the disability produced by the physical impairment[.]"

109 N.M. 142, 782 P.2d 395 (holding that amendments to the Act shall apply only to causes of action accruing after the effective date of the amendment). The WCJ awarded 84% PPD benefits for Worker's secondary mental impairment. He then ruled, consistent with the 1990 version of Section 52-1-42(A)(4), which was in effect in 2012, that the duration of Worker's secondary mental impairment benefits would be "the maximum period allowable for the disability produced by the physical impairment or one hundred weeks, whichever is greater." As a result, Worker received one hundred weeks of benefits for his resulting secondary mental impairment and only thirty-five weeks of benefits for the resulting physical impairment.

{12}     Worker argues that the WCJ erred in applying Section 52-1-42(A)(4) (1990) to limit the number of weeks of benefits he received for his secondary mental impairment. He contends that Section 52-1-42(A)(4) (1990)'s 100-week cap was invalidated in *Breen*, and therefore the 700-week cap set forth in Section 52-1-42(A)(1) should have been applied.

{13}     We disagree that *Breen* invalidated the 1990 version of Section 52-1-42(A)(4), at least as the WCJ applied it to the facts of this case. To be clear, we do not question that, even though the case involved benefits payable for a disability resulting from a primary mental impairment, the reasoning of *Breen* would apply equally to discrimination between benefits payable for a disability resulting from a secondary

10

mental versus a physical impairment. However, *Breen* requires only that benefits awarded for a mental (primary or secondary) impairment stemming from an injury be no less than the benefits awarded for a physical impairment that stems from the same injury. The WCJ complied with that requirement. By applying the 1990 instead of the 2015 version of Section 52-1-42(A)(4), Worker actually received *more* weeks of benefits for his secondary mental impairment than his physical impairment, even though both impairments stemmed from the same injury and subsequent unsuccessful medical interventions.

{14}    We note that our Supreme Court in *Breen* did not hold, or even suggest, that the language in the pre-2015 versions of Sections 51-1-41 and -42 addressing duration of benefits for disability resulting from secondary mental impairment—"the maximum period allowable for the disability produced by the physical impairment or one hundred weeks, *whichever is greater*"—was unconstitutional. Section 52-1-42(A)(4) (1990) (emphasis added). Instead, the Court ruled only that the absolute 100-week limit for disability benefits for primary mental impairment was unconstitutional.

{15}    The root of Worker's grievance in fact is not that his benefits for his mental disability are less than his benefits for his physical disability, which was the evil that was the focus of *Breen*. Rather, he objects to the Legislature's policy decision,

inherent in Section 52-1-43, that the duration of benefits for a mental impairment resulting from injury to specific body members should be less—sometimes dramatically less—than the duration of benefits payable pursuant to Section 52-1-42(A), (B) (1990) for a mental impairment resulting from a whole person injury. Worker urges:

> [T]reating [Worker] differently because he has mental limitations that may or may not be associated with an ankle injury than if he had a back injury is inappropriate, and is not allowed pursuant to *Breen*. . . . [T]he statute sets up a HUGE difference in how workers are treated under the Act (for the same mental injury).

In other words, Worker's point as we understand it is that, because Section 52-1-42(A)(4) ties the duration of partial disability benefits for secondary mental impairment to the duration of benefits payable for the underlying physical impairment, a worker who suffers a mental illness that results from a back injury will receive more benefits (pursuant to Section 52-1-42(A)(1), (2)) than a worker who suffers the same mental illness that results from a foot injury (pursuant to Section 52-1-43). The WCJ articulated the distinction thus: "[T]he [L]egislature made an intentional decision to tie the payment period for weekly compensation benefits in cases involving secondary mental impairment to the payment period allowed for the underlying physical injury." This is not the kind of discrimination that *Breen* prohibits. The discrimination at issue

here is not discrimination between benefits payable for disability resulting from physical versus mental impairment, and instead is discrimination between benefits payable for disability resulting from either physical or mental impairment based on the legislative decision to treat disability arising from injury to specific body members different than disability arising from injury elsewhere in the body. *Breen* does not prohibit this latter form of discrimination.

**B.      The WCJ's Decision Did Not Conflict With the Pre-Trial Order**

**{16}**      Worker argues that in the August 29, 2016, pretrial order that was approved by the WCJ, the parties and the WCJ agreed upon the scope of the issues to be tried and adjudicated, and that the WCJ's decision went beyond that scope by: (1) barring Dr. Rockwood from continuing to provide covered medical care to Worker; (2) "applying the affirmative defense of secondary mental impairment" and limiting the duration of Worker's PPD benefits for his mental illness to 100 weeks; (3) determining that Worker's accidental injury was limited to his great toe as opposed to his foot, with the result that his scheduled injury benefits under Section 52-1-43 were limited to 35 as opposed to 115 weeks.

**{17}**      "The pretrial order determines the issues [to be tried] and becomes the law of the case." *State ex rel. State Highway Dep't v. Branchau*, 1977-NMSC-048, ¶ 5, 90

N.M. 496, 565 P.2d 1013. The purpose of the requirement that issues be limited by a pretrial order is to reveal the parties' real contentions and eliminate unfair surprise. *Lewis ex rel. Lewis v. Samson*, 2001-NMSC-035, ¶ 26, 131 N.M. 317, 35 P.3d 972. "The principle is well established that a pretrial order, made and entered without objection, and to which no motion to modify has been made, controls the subsequent course of action." *Blumenthal v. Concrete Constructors Co. of Albuquerque, Inc.*, 1984-NMCA-122, ¶ 30, 102 N.M. 125, 692 P.2d 50 (internal quotation marks and citation omitted) (holding that trial court erred in reaching conclusions regarding laches and estoppel issues that were not raised in pretrial order).

{18}     However, "courts have 'wide latitude' to amend the pretrial order to conform to the evidence." *Fahrbach v. Diamond Shamrock, Inc.*, 1996-NMSC-063, ¶ 25, 122 N.M. 543, 928 P.2d 269. In addition, the pretrial order, while becoming the law of the case, "does not prevent the [district] court from changing [its] mind about [the] applicable law to prevent perpetuating error rather than facilitating the trial of the lawsuit on the genuine issues of fact and the law of the case." *Mantz v. Follingstad*, 1972-NMCA-164, ¶ 5, 84 N.M. 473, 505 P.2d 68. We will review a district court's decision to depart from the pretrial order for abuse of discretion. *See Fahrbach*, 1996-NMSC-063, ¶ 25; *cf. Lewis*, 2001-NMSC-035, ¶ 25 (holding that appellate court will

review for abuse of discretion a district court's decision with respect to a motion to modify a pretrial order to re-open discovery).

**1.  Dr. Rockwood**

{19}    In the pretrial order, the parties stipulated that Dr. Rockwood was "the present authorized treating HCP by way of referral from Dr. Mitchel on or about August 17, 2012." The parties also identified, as contested issues, the necessity and reasonableness of (1) additional surgery as proposed by Dr. Rockwood, (2) a topical scar cream as prescribed by him, and (3) several referrals by him to other health care providers. The pretrial order provided that, "The stipulations set forth in this Pre-Trial Order shall be and hereby are adopted by the Judge as ultimate findings of fact and/or ultimate conclusions of law." However, we do not view the parties' agreement that Dr. Rockwood had been and at the time of trial remained an authorized HCP as barring the WCJ from determining that Dr. Rockwood's proposed surgery and other medical care was not reasonable and necessary. Similarly, the agreement also did not bar the WCJ from determining that, because the treatment of Worker's CRPS necessitated that he be under the care of a trained and experienced pain medication specialist, Dr. Rockwood should be removed as the authorized HCP. For these reasons, we conclude

15

that the WCJ did not abuse his discretion in barring Dr. Rockwood from continuing to provide covered medical care to Worker.

**2.      Duration of Worker's PPD Benefits for Secondary Mental Impairment**

{20}      In the pretrial order, the parties stipulated that in addition to the original right foot sprain, CRPS, and gait disturbance, Worker suffered from panic attacks, chronic pain, depression, and anxiety as a natural and direct result of his on-the-job injury. The parties did not, however, make any stipulations regarding the duration of benefits to which Worker was entitled for his secondary mental impairment. They identified, as contested issues, the extent of Worker's permanent impairment for all compensable injuries, his whole person impairment rating, and "[t]he duration of benefit owed for any scheduled injuries."

{21}      In his proposed conclusions of law nos. 34 and 35, Worker contended, apparently pursuant to Section 52-1-42(A)(1) (1990), that he was entitled to payment of PPD benefits for 700 weeks and, apparently pursuant to Section 52-1-43(32) (one foot at the ankle), that he was entitled to payment of loss of use benefits for 115 weeks. In its proposed conclusions of law no. 21 and 22, Employer contended, apparently pursuant to Section 52-1-42(A)(2), that Worker was entitled to payment

16

of PPD benefits for 500 weeks and, apparently pursuant to Section 52-1-43(33), that he was entitled to payment of loss of use benefits for 115 weeks.

{22}     The WCJ effectively concluded that the duration of the PPD benefits to which Worker was entitled to receive as compensation for his mental impairment was to be determined by Section 52-1-42(A)(3) as opposed to (A)(1), as proposed by Worker, or (A)(2), as proposed by Employer[4]. We do not believe that the WCJ was barred from reaching this decision by either the pretrial order or the parties' proposed findings and conclusions. First, the parties had not reached any stipulations on this issue. While it was not specifically identified as a contested issue (as was the duration of Worker's scheduled injury benefit), the parties had generally identified as a contested issue the extent of Worker's impairment for all of his compensable injuries. Second, a district court is free to reject a party's proposed conclusions of law. *See Olivas v. Olivas*, 1989-NMCA-064, ¶ 15, 108 N.M. 814, 780 P.2d 640; *Gabriele v. Gabriele*, 2018-NMCA-042, ¶ 30, 421 P.3d 828, *cert. denied*, 2018-NMCERT-___ (No. S-1-SC-36945, May 4, 2018). Moreover, even if Worker's and Employer's implicit

---

[4] Worker provides no support for his characterization of Section 52-1-42(A)(3)'s provisions, tying the duration of benefits for secondary mental impairment to the duration of benefits for the underlying physical disability, as an "affirmative defense," and we are not aware of any textual basis for doing so.

17

agreement on the non-applicability of Section 52-1-42(A)(3) in determining the duration of Worker's PPD benefits is viewed as a stipulation, a court ordinarily is not bound by the parties' stipulations as to applicable law. *See Williams v. Mann*, 2017-NMCA-012, ¶ 30, 388 P.3d 295 (citing *Tsiosdia v. Rainaldi*, 1976-NMSC-011, ¶ 10, 89 N.M. 70, 547 P.2d 553). Third, and in any event, the WCJ in its discretion was free to change its mind about the applicable law, which is how the WCJ's decision is properly characterized. *See Mantz*, 1972-NMCA-164, ¶ 5. For all of these reasons, the WCJ did not abuse his discretion in limiting Worker's PPD benefits for his secondary mental impairment to 100 weeks.

### 3. Right Foot Versus Right Great Toe Injury

{23} In the WCJ's original September 22, 2016 compensation order, he found that as a natural and direct result of the May 3, 2012 on-the-job accident, Worker had "suffered a compensable physical injury to his right foot at the ankle." However, based on Worker's September 29, 2016 motion to reconsider the September 22, 2016 compensation order, the WCJ entered an order on motion for reconsideration on October 24, 2016, that amended the Compensation Order finding that Worker had suffered a compensable physical injury "to his right great toe with the metatarsal

18

thereof." The WCJ elaborated on his reasoning in his November 22, 2016 memorandum opinion:

> [U]pon close examination of the parties' stipulations in the Pre-Trial Order it became clear to WCJ Skinner that the actual physical injury was to the right great toe with metatarsal thereof. WCJ Skinner readily acknowledges the existence of other evidence in the record that could support findings of additional injury to the entire right lower extremity, the low back, left knee injury and PTSD. In the end WCJ Skinner found the opinions expressed by the panel IME and the stipulations entered into between the parties to be persuasive in terms of the nature and extent of Worker's compensable injuries.

{24} The pretrial order does not clearly specify that Worker injured his right great toe or his right ankle. It states that he has a disability "in his right lower extremity as diagnosed by the IME panel of 'Right foot sprain,'" but the medical description that follows describes the injury to and subsequent medical treatment of his toe. Further, the pretrial order identifies, as contested issues, "[t]he extent of injuries causally connected to the work accident" and "[t]he duration of benefit owed for any scheduled injuries." Therefore, we do not believe the pretrial order precluded the WCJ from determining that Worker's injury was to his right great toe versus his right foot as a whole.

{25} Worker argues, however, that because both parties stated in their proposed findings and conclusions that Worker had an injury to his right foot and was entitled

to 115 weeks of loss of use benefits, the WCJ erred in only awarding Worker thirty-five weeks for a toe injury. As stated above, the WCJ was not bound by the parties' proposed findings and conclusions. Further, the medical testimony also supported the WCJ's amended finding regarding the location of Worker's injury[5]. For instance, an evaluation by Dr. Theresa M. Genovese-Elliott stated that Worker's injury occurred when he "hyperflexed the right foot injuring the right great toe." Also, Worker's past surgeries were done exclusively on his right toe. Dr. Rockwood stated in his deposition that "the first procedure which was performed on [September 6, 2012] was an excision of a small bone underlying one of the joints on the great toe area, as well as repair of the capsule and excising a small bone fragment from another joint in the great toe," and "the second surgery was a fusion of the first metatarsal joint [the big joint of the big toe] as well as resection of a painful nerve and implantation into a muscle." We see no abuse of discretion in the WCJ's decision to award 35 weeks of

[5]Worker initially argued in a footnote in his brief in chief that awarding benefits only for the toe was not supported by substantial evidence. In his reply brief, however, Worker disclaimed any substantial evidence challenge: "The question on appeal does not seek an evidentiary evaluation of whether substantial evidence supports the WCJ's decision." Worker's substantial evidence challenge is therefore abandoned and will not be considered.

scheduled injury loss of use benefits pursuant to Section 52-1-43(A)(33), based on injury to his right great toe.

**C.    The WCJ Did Not Err in Applying the AMA Guides Sixth Edition to Determine Worker's Impairment Rating**

{26}    Worker argues that the WCJ erred in relying in applying the AMA Guides Sixth Edition to determine his impairment rating. Specifically, Worker contends that, assuming Section 52-1-24(A) required the WCJ to determine Worker's impairment rating based on the AMA Guides Sixth Edition, then the statute constitutes an unconstitutional delegation of authority from the Legislature to a private entity. Alternatively, Worker argues that the WCJ erred in not departing from the impairment rating generated by the AMA Guides Sixth Edition. That is, because he suffers from CRPS, gait dysfunction, and chronic pain, the AMA Guides Sixth Edition should not have been determinative of his impairment rating and thus limit his recovery; instead, he should have been awarded whole person benefits pursuant to Section 52-1-42(A)(1), (2) and should not have been limited to benefits solely for his toe injury under Section 52-1-43(A)(33). We review de novo the WCJ's construction of Section 52-1-24(A) and application of the statute to the facts. *See DeWitt v. Rent-A-Center, Inc.*, 2009-NMSC-032, ¶ 14, 146 N.M. 453, 212 P.3d 341; *Ruiz v. Los Lunas Pub. Sch.*, 2013-NMCA-085, ¶ 5, 308 P.3d 983.

21

## 1.    Relevant Provisions of the Act

{27}    Section 52-1-26(B) defines "partial disability" as "a condition whereby a worker, by reason of injury arising out of and in the course of employment, suffers a permanent impairment." Section 52-1-24(A) defines "impairment" as

> an anatomical or functional abnormality existing after the date of maximum medical improvement as determined by a medically or scientifically demonstrable finding and *based upon the most recent edition of the American medical association's guide to the evaluation of permanent impairment or comparable publications of the American medical association.*

(Emphasis added.) Consistent with Section 52-1-24(A), 11.4.7.7(V) NMAC defines "physical impairment rating" as:

> an evaluation performed by an MD, DO, or DC to determine the degree of anatomical or functional abnormality existing after an injured or disabled worker has reached maximum medical improvement. The impairment . . . is expressed as a percent figure of either the body part or the whole body, as appropriate, *in accordance with the provisions of the [Act] and the most current edition of the American medical association's guides to the evaluation of permanent impairment*[.]

(Emphasis added.) The Legislature's purpose in mandating application of the AMA Guides, now in its sixth edition, is "to achieve objectivity and fairness in the disabilty determination process because the AMA Guide[s] offer[] an objective method for evaluating the degree of permanent impairment." *Madrid v. St. Joseph Hosp.*, 1996-NMSC-064, ¶ 9, 122 N.M. 524, 928 P.2d 250.

22

**{28}** Section 52-1-42(A) authorizes benefits for permanent partial disability "not specifically provided for in Section 52-1-43." This language has been construed to mean that, where there is a separate and distinct impairment to other parts of the body in addition to the disability resulting from injury to the scheduled member, a worker may receive both scheduled injury (pursuant to Section 52-1-43) and PPD (pursuant to Section 52-1-42) benefits. *See Hise Constr. v. Candelaria*, 1982-NMSC-109, ¶¶ 10-13, 98 N.M. 759, 652 P.2d 1210; *Gomez v. Bernalillo Cty. Clerk's Office*, 1994-NMCA-102, ¶ 12, 118 N.M. 449, 882 P.2d 40. Pain itself, without more, can constitute a separate and distinct impairment to a non-scheduled part of the body. *See Harrison v. Animas Valley Auto & Truck Repair*, 1988-NMSC-055, ¶ 13, 107 N.M. 373, 758 P.2d 787 (Ransom, J., specially concurring); *Gordon v. Dennisson Doors, Inc.*, 1992-NMCA-136, ¶ 10, 114 N.M. 767, 845 P.2d 861.

**2.      Evidence Regarding Worker's Impairment and the WCJ's Impairment and Disability Benefits Ruling**

**{29}** Dr. Head, who participated in a panel IME of Worker, testified that Worker's on-the-job injury to his toe ultimately resulted in CRPS and gait dysfunction that were not confined to the toe. She further testified that the impairment to his body as a whole resulting from the pain and gait dysfunction could be as high as thirty-five percent and that under the AMA Guides Fifth Edition, Worker would be eligible for whole person

23

impairment for his CRPS. Based on this evidence, Worker sought not only scheduled injury benefits for loss of use of his foot pursuant to Section 52-1-43 but also thirty five percent PPD benefits for 500 or 700 weeks under Section 52-1-42(A)(1), (2).

{30}    However, the AMA Guides Sixth Edition dictated a different result. Section 16.5 of the treatise describes CRPS as

> a challenging and controversial concept, difficult to diagnose accurately[.] . . . Therefore, this is a particularly challenging diagnosis to rate.
>
> . . . .
>
> The rating for CRPS is a "stand alone" approach. *If impairment is assigned for CRPS, no additional impairment is assigned for pain from Chapter 3 nor is the CRPS impairment combined with any other approach for the same extremity*[.]

(Emphasis added.) On this basis, in its report the IME panel concluded that:

> As per the AMA Guides, Sixth Edition (page 540) "The rating for CRPS is a 'standalone' approach. If impairment is assigned for CRPS, no additional impairment is assigned for pain from Chapter 3 [of the AMA Guides Sixth Edition], nor is the CRPS impairment combined with any other approach for the same extremity from this chapter [16]." Thus, [Worker] is assigned a 7 percent lower extremity impairment for his diagnoses as per above.

In her deposition, Dr. Head reiterated:

> [I]t is my reasonable medical opinion that strict interpretation of the [AMA Guides Sixth Edition] requires the rating of [Worker]'s diagnosis of CRPS I under Chapter 16, the Lower Extremities, via section 16.5

24

Complex Regional Pain Syndrome Impairment, as was previously conducted in the July 2014 IME. The guides repeatedly state that CRPS is challenging. Despite [Worker]'s difficult diagnosis, it is my reasonable medical opinion that strict interpretation of the [AMA] Guides Sixth Edition requires the impairment rating as previously conducted.

{31} Based on the AMA Guides Sixth Edition and the medical experts' opinions, in his October 24, 2016 order on motion for reconsideration, the WCJ ruled that Worker had a 7% lower extremity impairment, did not have a whole body impairment resulting from CRPS and his gait derangement, and awarded benefits for 35 weeks based on 50% loss of use of Worker's great toe pursuant to Section 52-1-43(A)(33). The WCJ further stated in his November 2, 2016 memorandum opinion:

> While it is certainly true that WCJ Skinner could rely on the opinions of Dr. Head to assign whole person impairment ratings to Worker under previous versions of the AMA Guides, the frank fact is the most recent version of the AMA Guides does not assign a whole person impairment for CRPS. WCJ Skinner simply could not find evidence of a whole person impairment to a separate and distinct body part or function pursuant to the most recent version of the AMA Guides as the result of Worker's physical injury to the right lower extremity. Thus it is WCJ Skinner's opinion that the statutory standard for payment of weekly compensation benefits as the result of Worker's physical injury is loss of use under [S]ection 52-1-43.

{32} As we understand his argument, Worker does not contend that the WCJ's decision was not consistent with the AMA Guides Sixth Edition. On the contrary, Worker concedes that "Dr. Head testified that despite the chronic pain, gait

25

dysfunction and nervous system involvement of CRPS, the AMA Guides was revised in the [Sixth Edition] to state that it does not allow a doctor to provide impairments beyond the lower extremity for any medical condition related to CRPS, even if another impairment rating is available (i.e.[,] it is a 'standalone impairment')." Worker argues instead that, in view of the evidence that he suffered physical impairment that extended beyond his foot as a result of the CRPS and gait dysfunction, the WCJ abused his discretion in simply following the AMA Guides Sixth Edition; in the alternative, if the WCJ was bound to so decide on the basis of Section 52-1-24(A), then the statute amounts to an unconstitutional delegation of the Legislature's authority.

**3.     *Madrid v. St. Joseph Hospital***

{33}     *Madrid* disposes of Worker's argument. In that case, two workers suffered on-the-job back injuries. 1996-NMSC-064, ¶¶ 3-6. After their health care providers gave impairment ratings, presumably based on the then-current version of the AMA Guides and which the workers believed were too low, they challenged the constitutionality of Section 52-1-24(A)'s requirement that impairment determinations be based on the AMA Guides. *Madrid*, 1996-NMSC-064, ¶¶ 3-6. Specifically, the workers argued that the AMA Guides "was developed solely to assist doctors in the rating of physical

26

impairment, without regard to the impact of the particular impairment on the loss of work capacity[,]" and not "to measure a worker's disability or to determine the impact of an individual's impairment on his or her capacity to work." *Id.* ¶ 6. Because "use of the AMA Guide[s] ties compensation to a standard that has no relationship to the actual occupational or vocational disability[,]" workers contended that by requiring use of the most recent edition of the AMA Guides in evaluating impairment, Section 52-1-24(A) amounted to an unconstitutional delegation of legislative authority. *Madrid*, 1996-NMSC-064, ¶ 7.

**{34}** Our Supreme Court initially observed that Section 52-1-24(A) was presumptively constitutional. *Madrid*, 1996-NMSC-064, ¶ 10. Further, "[a]bsent proof beyond a reasonable doubt that the Legislature has enacted a statute which is unconstitutional, [courts] will uphold the statute. [The Court] will not question the wisdom, policy, or justness of legislation enacted by our Legislature." *Id*. The Court noted as well that the Legislature can authorize governmental agencies "to formulate rules and regulations so long as it does not give the outside entity *the power to determine what the law will be*." *Id.* ¶ 13 (emphasis added).

**{35}** The Court then reviewed case law from other jurisdictions involving claims that a legislature's incorporation of a private organization's standards into a statutory

scheme amounted to an unconstitutional delegation of authority, even where the standards are subject to periodic revision by the private entity. *Id.* ¶¶ 14-18. The Court identified several "compelling rationales," *id.* ¶ 14, for utilization of such standards in legislation: the standards are issued by well-recognized, independent authorities, *id.*; the standards provide guidance on technical and complex matters that are within the authorities' area of expertise, *id.*; legislatures lack the time, expertise and resources to develop their own standards, *id.* ¶ 16; the private organization's standards are developed and have significance independent of the legislative enactment, *id.* ¶¶ 14, 17; and the standards are periodically updated to account for new scientific discoveries, *id.* ¶ 15. The Court found that all of these considerations were applicable to and justified incorporation of the AMA Guides' impairment evaluation standards into the Act, *id.* ¶¶ 20-22, and on that basis concluded that Section 52-1-24(A) did not unconstitutionally delegate the Legislature's authority. *Madrid*, 1996-NMSC-064, ¶ 23.

**4.** **The WCJ Did Not Err in Basing His Impairment Rating on the AMA Guides Sixth Edition**

{36} Because it is not materially different from the argument that the Court addressed and rejected in *Madrid*, we similarly reject Worker's argument in this case regarding unconstitutional delegation of legislative authority. The AMA Guides Sixth

28

Edition is the most recent version of the publication. *Madrid* makes clear that the Legislature constitutionally may adopt it for the purpose of establishing how impairment ratings are to be determined under the Act. Therefore, the WCJ did not err in determining Worker's impairment rating in accordance with the document.

{37}     Worker additionally argues, however, that given the circumstances of this case—in particular, the evidence of Worker's pain and gait derangement and the medical experts' opinions that, absent the dictates of the AMA Guides Sixth Edition regarding the "standalone" impairment rating for CRPS, Worker would qualify for a 35% whole body impairment—the WCJ abused his discretion in not departing from the impairment rating generated by the AMA Guides Sixth Edition. We need not address whether the WCJ's decision amounted to an *abuse* of discretion, *see Cordova v. Taos Ski Valley, Inc*., 1996-NMCA-009, ¶ 15, 121 N.M. 258, 910 P.2d 334, because under the circumstances of this case we do not believe the WCJ possessed any discretion at all to depart from the impairment rating generated by the AMA Guides Sixth Edition. *Madrid* identifies two situations in which a workers compensation judge would have discretion to depart from an impairment rating based on the AMA Guides: "Where evidence is conflicting, the ultimate decision concerning the degree of a worker's impairment and disability rests with the workers' compensation judge.

29

Furthermore, where the AMA Guide is an inadequate reference, the statute explicitly allows for reference to other AMA publications." 1996-NMSC-064, ¶ 19. *See also Peterson v. N. Home Care*, 1996-NMCA-030, ¶¶ 11-18, 121 N.M. 439, 912 P.2d 831 (holding that WCJ should have given an impairment rating and awarded permanent partial disability benefits based on secondary mental impairment, even though AMA Guides does not provide for numerical impairment rating for mental impairments). However, neither of those exceptions were applicable in this case. There was no conflicting evidence regarding Worker's impairment and, while Worker disagreed with the result, the AMA Guides Sixth Edition provided adequate reference. Therefore, per Section 52-1-24(A), the WCJ was bound to follow the AMA Guides Sixth Edition.

{38} Lastly, Worker argues that in its most recent edition of the Guides, the AMA has "extended their mandate beyond being a reference tool with a limited function. . . . to defin[ing] the nature and extent of injuries, redefin[ing] compensability of medical conditions, and control[ling] payment of disability." *Madrid* considered, and unambiguously found constitutional, Section 52-1-24(A)'s incorporation of the AMA Guides notwithstanding the fact that it is subject to periodic revision. *Madrid*, 1996-NMSC-064, ¶¶ 14-15. *Madrid* identified, as the criterion for determining whether

30

there was an unconstitutional delegation of legislative authority, whether the outside entity is given "the power to determine what the law will be." *Id.* ¶ 13. We do not view the AMA Guides Sixth Edition's adoption of a "standalone" approach to determining lower extremity impairment where there is a diagnosis of CRPS as determining what the law will be. Rather, it represents the AMA's best attempt to evaluate impairment under those "difficult," "challenging," and "controversial" circumstances. The Legislature having determined that impairment ratings should be based on the most recent edition of the AMA Guides, we "will not question the wisdom, policy, or justness" of that decision. *Id.* ¶ 10. If Worker now believes the AMA Guides is no longer an appropriate basis for making impairment ratings that form the basis for a workers' compensation judge's disability benefits decision, his remedy lies with the Legislature.

**CONCLUSION**

**{39}** We affirm the WCJ's decision as reflected in his September 22, 2016 compensation order and November 2, 2016 amended compensation order, as modified by the WCJ's October 24, 2016 order on motion for reconsideration, and November 22, 2016 memorandum opinion.

**{40}** **IT IS SO ORDERED.**

_____

**HENRY M. BOHNHOFF, Judge**

**WE CONCUR:**

_____

**M. MONICA ZAMORA, Judge**

_____

**EMIL J. KIEHNE, Judge**